NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0648n.06
Case No. 07-1265

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ARDRA YOUNG,                                )
                                            )
    Petitioner-Appellant,                   )
                                            )        ON APPEAL FROM THE
                v.                          )        UNITED STATES DISTRICT
                                            )        COURT FOR THE EASTERN
PAUL RENICO, Warden,                        )        DISTRICT OF MICHIGAN
                                            )
    Respondent-Appellee.                    )
                                            )
                                            )
_____     )

BEFORE: BATCHELDER, Chief Judge; SUHRHEINRICH and SUTTON, Circuit Judges.

**ALICE M. BATCHELDER, Chief Judge.** Ardra Young is serving concurrent life sentences in a Michigan state prison for the shooting deaths of his wife and teenaged son. He appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Young argues that he received ineffective assistance of counsel when his state trial attorney failed to move to suppress his confession as the fruit of an unlawful seizure. Because Young's Fourth Amendment claim is without merit, his trial counsel was not derelict in not raising it. We therefore AFFIRM.

**I.**

In the late night hours of February 8, 1997, Detroit police officers were called to a city park to investigate a possible shooting. They discovered a parked Toyota Corolla with its engine running; the vehicle had a flat rear tire, the rear passenger door was open, the trunk lid was raised, and a spare tire and jack lay nearby. Inside the car, Terry Young was slumped over in the driver's seat, and her

fifteen-year-old son Michael lay across the back seat, his feet dangling out the door. Both had gunshot wounds to the head. Terry was pronounced dead at the scene; Michael was unconscious, and his breathing was labored. Officers found an open purse on the rear floor, with approximately $300 cash inside.

Early the next morning, homicide detective Arlie Lovier went to the evidence garage where the victims' car had been taken. He noticed that the right rear tire was flat and had mud on the bottom, while the other three tires were full and clean. Also, the valve cap for the flat tire was missing. Lovier suspected that someone had drained the air out of the tire after the car had stopped on the shoulder of the road. Later that morning, Lovier visited the crime scene and found a valve cap.

Meanwhile, Detective Isaiah Smith was calling the Youngs' friends and family members. One of Terry's friends told Smith that Terry had not had sex with her husband, Ardra Young, for more than a year and that Ardra had a girlfriend. Around noon, Ardra Young arrived at the homicide section office, where he was directed to Smith. Smith advised Young of his *Miranda* rights and had him sign an advisement-of-rights form. Young and Smith were seated around Smith's desk in the squad room, an open office area where several detectives had their workstations. Young initially gave an exculpatory statement in which he claimed that he had been in Bolingbrook, Illinois, the previous night and that it was only upon checking his home voice mail around 3:00 A.M. that he learned something was wrong at home.

During Smith's questioning of Young, Smith asked if he owned any firearms, and Young replied that he owned two handguns, one of which he was carrying on his person. When Lovier — who had now returned from the crime scene — heard Young say that he had a handgun, he

2

interrupted and told Young: "[T]o make sure everybody's safe here, you know, you're pretty upset, your wife has just been murdered, your son's in the hospital, let's just let me have your gun." Young handed the gun to Lovier, who locked it in his desk drawer.

After Young had given his initial statement, Smith and Lovier left Young sitting at the desk while they conferred. Lovier told Smith about the flat, muddy tire and the valve cap he had discovered. Smith called the hospital and talked to Dr. Robert Johnson, the physician who had been treating Michael Young. Dr. Johnson told Smith that Young had been by the hospital that morning and had immediately directed that his son be taken off life support, and that Michael had died.

After receiving this information, Smith returned to confront Young, telling him "that he would not walk out of there because the statement he gave [Smith] was bullshit." Smith again advised Young of his constitutional rights, and Young provided a second statement. This time, Young admitted to the murders:

> What I said to you earlier in the statement was the truth except I did come back to Detroit on Saturday night on February 8, 1997. I arrived in Detroit about nine-thirty p.m. and went to a do-it-yourself carwash and washed my car. I then went to a phone booth, called my wife, Terry, who was at home. I told her to come and meet me at West Outer Drive and Milford. About 10 minutes later Terry and Michael arrived in her car and she parked in back of me. I went back to their car and got my son out and sat him in my car. I then went back and got in the back seat on the passenger side of her vehicle. I then pulled a .38 caliber revolver, six-shot, I had taken from my father's house that was in my coat pocket. I cocked it and fired one shot into the back of her head as she sat behind the wheel of her car. The shot struck her in the back of the head and she slumped over in the front seat.

> I then got out of the car and called for my son to come back to the car and he did. I told him to get in the back seat and reach under the seat on his mother's side and I shot him in the head and he slumped down and I crawled over the front seat and got out the passenger front door and got back into the car and drove back to Bolingbrook, Illinois, to the motel I was staying at.

3

When Smith asked Young why he killed his wife and son, Young said that he did it "[t]o be free." Young explained the crime scene details, saying that he had "told [Terry] to open the trunk and [he] took the jack out and let the air out of the tire to make it look like a flat tire incident." Young revealed that he had hidden the gun in his attic. Lovier and other officers searched Young's home, and in the corner of the attic Lovier found a .38 caliber revolver wrapped in sponge rubber and plastic. Forensic testing revealed that bullets and a spent cartridge casing recovered from the crime scene had been fired from the revolver found in Young's attic.

## II.

In 1997, a jury convicted Young of two counts of first-degree murder and two counts of possession of a firearm during the commission of a felony. He was sentenced to concurrent terms of mandatory life imprisonment for the murder convictions and two years' imprisonment for each felony-firearm conviction. On direct appeal, the Michigan Court of Appeals affirmed his conviction, and the Michigan Supreme Court denied leave to appeal.

On March 15, 2001, Young filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 with the United States District Court for the Eastern District of Michigan. The district court denied the petition on November 19, 2002. Young filed a motion to alter or amend the judgment, which the district court construed as a motion under Federal Rule of Civil Procedure 60(b). The court ordered counsel appointed for Young and ultimately granted the motion, ordering an evidentiary hearing before the magistrate judge on the question of whether Young's trial counsel was ineffective for failing to move to suppress his confession as the fruit of an illegal arrest. On January 7, 2005, the magistrate judge issued a Report and Recommendation advising that Young's trial counsel was not ineffective for failing to raise the Fourth Amendment claim because the claim

4

lacked merit. In an Order and Opinion dated January 23, 2007, the district court agreed, adopted the magistrate judge's Report and Recommendation, and again denied Young's habeas corpus petition. This appeal followed.

**III.**

We review the district court's decision de novo. *Slaughter v. Parker*, 450 F.3d 224, 232 (6th Cir. 2006) (citing *Smith v. Hofbauer*, 312 F.3d 809, 813 (6th Cir. 2002)). Because Young filed his habeas petition in 2001, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply. *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) (AEDPA applies to petitions filed after April 24, 1996).

AEDPA prohibits us from granting a state prisoner's habeas petition unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

"A state court decision is 'contrary to' clearly established Federal law if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a different result." *Slaughter*, 450 F.3d at 232 (quoting *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (internal quotations omitted)). A state court decision unreasonably applies federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts." *Slaughter*, 450 F.3d at 232 (citing *Williams*, 529 U.S. at 407-08). "A federal habeas court may not issue a writ under the

5

unreasonable application clause simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "'[T]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold.'" *Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

**IV.**

Young argues that the Michigan courts unreasonably applied federal law in holding that his trial counsel was not ineffective in failing to raise a Fourth Amendment challenge to his confession. A habeas petitioner seeking to convince a reviewing court that his counsel's assistance was constitutionally ineffective must prove both prongs of a two-prong test. "First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Nichols v. United States*, 563 F.3d 240, 248 (6th Cir. 2009) (en banc) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Defense counsel's performance need not have been excellent or even good: It is deficient only where it falls below "the [wide] range of competence demanded of attorneys in criminal cases." *Id.* (citation omitted).

"Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious [that those errors] deprive[d] the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 249 (quoting *Strickland*, 466 U.S. at 687). "Because the petitioner must satisfy both prongs, the inability to prove either one of the prongs — regardless of which one — relieves the reviewing court of any duty to consider the other."

6

*Id.*

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Here, Young argues that his confession was the fruit of an illegal seizure. Specifically, Young contends that the officers kept him in the homicide section squad room without probable cause and that they exploited this unconstitutional detention to gather more evidence against him, which prompted his confession. Young's reasoning fails because by the time he was actually in custody for Fourth Amendment purposes the officers had probable cause to detain him.

"A 'seizure' occurs when police detain an individual under circumstances where a reasonable person would not feel free to leave." *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006) (citing *United States v. Obasa*, 15 F.3d 603, 606 (6th Cir.1994)). We have held that "the determination of whether a defendant is in custody for Fourth Amendment purposes 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *United States v. Shaw*, 464 F.3d 615, 622 (6th Cir. 2006) (quoting *Stansbury v. California*, 511 U.S. 318, 320 (1994)). In making a custody determination, "we consider factors such as 'the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force.'" *Lopez-Medina*, 461 F.3d at 740 (quoting *United States v. Lopez-Arias*, 344 F.3d 623, 627

7

(6th Cir. 2003)).

Young contends that he was in the custody of the homicide detectives once he reported to the office and was advised of his *Miranda* rights. While we have held that an officer's recitation of *Miranda* warnings provides some "evidence that the nature of the detention has grown more serious," we have been careful to note that the giving of such warnings does not automatically signal the beginning of a custodial arrest. *Obasa*, 15 F.3d at 608; *see also State v. Damon*, 570 A.2d 700, 705-06 (Conn. 1990) ("[T]he issuance of *Miranda* warnings as a cautionary measure does not mean that the defendant had been arrested."). This is so because the fundamental inquiry remains whether a reasonable person would have felt free to end the encounter with the police and go on his way. In conducting this inquiry, we should consider the fact that Detective Smith issued *Miranda* warnings to Young as soon as he entered the station, but we should also analyze the other circumstances surrounding the interrogation.

At a pre-trial hearing on a separate issue, Young testified that he reported to the homicide section at the request of someone he identified as "Officer Russell." Young stated that he talked to Russell at 4:30 A.M. and arrived at the homicide section "[r]ight around noon." Young chose the time of his arrival, and there is no indication that any officer threatened him with arrest if he did not show up. Moreover, a reasonable person whose wife and son had just been shot would expect to be contacted by police for questioning. When Young arrived, though he was read his *Miranda* rights, he was not handcuffed or restrained in any way. No one told him that he was under arrest, that he was a suspect, or that he was not free to leave. Detective Smith did not put him in a locked interrogation room, but showed him to a desk in the middle of an open office area. Given the totality of these circumstances, the Michigan Court of Appeals did not unreasonably apply federal law in

8

holding that the issuance of *Miranda* warnings to Young did not transform his voluntary arrival at the police station into a custodial arrest.

Young next contends that the detectives seized him when they confiscated his handgun, which he possessed under a valid concealed-carry permit. This argument also is without merit. Although Detective Lovier locked Young's gun in a desk drawer "to make sure everybody [was] safe" during the interview, Lovier did not tell Young that he was going to keep the gun as evidence or that Young would not be allowed to leave the station with the gun. As the district court below observed, "[a] reasonable person would not take the request to check a handgun in at a police station as signifying an arrest; rather it simply amounted to a reasonable precaution incident to the regular discharge of police business." Young points out that Detective Smith testified that it was not department policy to take visitors' lawfully-possessed handguns and that he planned to "take that gun and have it test fired to see if indeed the slugs removed from [Terry Young's] head was [sic] from that gun." But what matters for our analysis is what a reasonable person in Young's position would have perceived, not what the officers' subjective intentions were. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (An officer's subjective intention "is irrelevant except insofar as that may have been conveyed to the respondent.").

Finally, Young contends (and we agree) that he was in custody once Detective Smith told him that he "would not walk out of there" because his initial statement was "bullshit." But by that point, the officers had probable cause to detain Young. In determining whether probable cause existed, we examine the "totality of the circumstances." *Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be

9

admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Id.*

When Detective Smith told Young that he would not walk out of there, Smith and Detective Lovier had sufficient evidence to believe that Young was involved in the murder of his wife and son. First, one of Terry Young's girlfriends had told Smith that Terry and Ardra Young had not been physically intimate for more than a year and that Ardra had a girlfriend. Second, the officers reasonably concluded that the motive behind the murders was not robbery, as the keys were found in the ignition of the victims' car and Terry's purse lay open on the floor with more than $300 cash inside. Third, there were indications that the crime scene had been staged: the flat right rear tire was the only tire with mud on it — and only on the flat bottom, and the missing valve cap was found at the scene. All of this suggested that someone released the air from the tire after Terry had stopped her vehicle on the shoulder of the road. Fourth, Smith had learned from the physician treating Michael Young that Ardra Young, upon learning of his son's condition, immediately directed that he be removed from life support. The Michigan Court of Appeals did not unreasonably apply federal law in determining that these facts, taken together, provided "ample evidence of defendant's involvement in the shootings to justify his custodial interrogation prior to his making a confession." *People v. Young*, No. 208788, 2000 WL 33521874, at *2 (Mich. Ct. App. 2000).

## V.

Because Young has not proven that his Fourth Amendment claim is meritorious, he cannot show that he was denied the effective assistance of counsel when his trial counsel did not raise it. Accordingly, we **AFFIRM** the judgment of the district court.

10