GORSUCH, Circuit Judge.
Do we have to decide a qualified immunity appeal involving close questions of law that the district court hasn’t yet addressed? Do the police violate a suspect’s clearly established rights by requesting his hospital records? And do authorities have probable cause to arrest a trained marksman who makes suspicious statements in the wake of a shooting, who leads officers on a high speed chase, and who has a recently concealed rifle shell casing lying at the bottom of his trash can? We answer no to the first two questions and yes to the last.
I
On a summer evening in 2005 a sniper shot down a police helicopter over Albuquerque. When the authorities reached the scene, one man stood out. His name was Jason Kerns. Mr. Kerns was quick to tell the police that he was watching the helicopter from his backyard when it went down — and that he had heard a loud, ear-ringing pop just to his left and the sound of rocks kicking up nearby. In response to this information, SWAT and K-9 units canvassed the area Mr. Kerns described.
They soon noticed that something seemed amiss when they reached Mr. Kerns’s house: a door was ajar, music was playing, no lights were on. Things took an even darker turn when the officers noticed a broken window. A silver-dollar-sized hole punctured a window of the house, with shattering concentrically outward. This, the police thought, might be the result of a gunshot — perhaps by the same sniper who had just fired on the police.
Concerned that an armed suspect might be hiding inside (perhaps even holding hostages), three officers — Bader, Thompson, and Carter — attempted to make contact with the occupants of the house. No one answered their repeated knocks. Finding a side door unlocked, Officers Bader, Thompson, and Carter announced and entered. Inside they soon encountered Mr. Kerns’s girlfriend, Michelle Zisser, who hadn’t heard their knocks. One of the officers explained that he was looking for a possible shooting suspect and was concerned the suspect might be hiding *1178 somewhere inside. Ms. Zisser agreed to let them look around. The police did a quick sweep, everything appeared to be in order, and they soon left. Indeed, it later turned out that the broken window had been caused by an errant golf ball some time before.
As police continued to investigate, it seemed to them that some of Mr. Kerns’s statements didn’t add up. He told police that he had heard a loud clap when the helicopter went down. But none of his neighbors reported hearing anything like this. He told police that rocks kicked up nearby at the same time. But the police couldn’t find a rock bed anywhere near the location Mr. Kerns described. Deputy Lindley learned that Mr. Kerns had served in the military as a helicopter mechanic and marksmanship instructor. Deputy Lindley also learned that Mr. Kerns had been trained to hit man-sized targets up to 2100 feet away — and could likely hit a helicopter-sized target at a much greater distance. For his part, Mr. Kerns estimated that the helicopter had been less than 1000 feet away from his house when it was shot down.
Later interactions with Mr. Kerns only made him appear more suspect in the authorities’ eyes. In a written statement, he admitted that he had been looking at the helicopter and had been “annoyed” by it. He bragged to Deputy Lindley that he would have been able to “make that shot” with “no problem.” He added that he had trained to take shots at even greater distances. Deputy Lindley prodded Mr. Kerns a bit, asking him whether someone near Mr. Kerns’s house would have been able to see the helicopter from that angle. Not missing a beat, Mr. Kerns replied that he had been able to see the helicopter just fíne, and the way it was backlit made it “a great target.” He even explained how the helicopter’s red strobe lights gave him an indication of the helicopter’s flight path.
Later, detectives attempted to follow Mr. Kerns in an unmarked car. It wasn’t long before Mr. Kerns noticed he was being tailed and began to drive over one hundred miles per hour in an admitted attempt to lose the trailing car. As he later explained, he thought he was being followed by police and “if they’re just watching now, I’m not gonna make it easy for anybody.” Aplt.App. at 215. He also told investigators that he suffered from Post Traumatic Stress Disorder (PTSD), and that being followed by an unmarked police car had triggered a negative reaction. He declined to tell police, however, what other situations might prompt his PTSD.
Eventually, the Bernalillo County Sheriffs Department executed a warrant to search Mr. Kerns’s home for weapons and ammunition. They found plenty of both, as well as a silencer, military literature, and several high power rifles they thought capable of downing a helicopter. One rifle in particular, a Fabrique Nationale Model 30.06 bolt-action rifle (“FN rifle”), captured their attention. As part of the search, police also examined the trash outside Mr. Kerns’s home. There they found something else curious: a spent rifle shell wrapped in tape and buried at the bottom of the trash can. Mr. Kerns said the shell was an old one he found while cleaning his garage. But analysis of the tape showed that it was fresh, neither dry nor dirty. All this suggested to police that someone had attempted to conceal the shell and had done so recently.
While these events were unfolding, Sheriff White began to question whether Mr. Kerns could lawfully possess weapons at all. Given Mr. Kerns’s admission that he suffered from PTSD, Sheriff White decided to investigate whether he had ever *1179 been adjudicated to have a mental defect and so unable to possess firearms under 18 U.S.C. § 922(g)(4). In aid of his effort, the Sheriff sent a letter to the local Veteran Affairs hospital, where Mr. Kerns had received psychiatric treatment, asking for “any and all records possessed by the VA pertaining to [Mr. Kerns’s] psychiatric condition as it would apply to 18 U.S.C. [§ ] 922(g)(4).” ApItApp. at 308. A few days later the hospital voluntarily complied.
Meanwhile, other investigators sought to learn more from the wreckage of the helicopter. They evaluated the apparent trajectory of the bullet through the helicopter to determine where the bullet had come from, and they retrieved a few fragments of the bullet itself. Though these fragments were badly mangled, a forensic expert, Michael Haag, told investigators that the bullet could have come from Mr. Kerns’s FN rifle but not his other high powered rifles. Mr. Haag also concluded that the FN rifle fired the spent cartridge retrieved from Mr. Kerns’s trash.
Another investigator, Deputy Koren, was able to retrieve GPS data from the crashed helicopter. Using this data, he estimated the direction the helicopter was facing at the time it was hit and calculated that the aircraft was about 1670 feet from Mr. Kerns’s house. Deputy Koren also combined the entry angle of the bullet with an approximation of the helicopter’s altitude at the time of the shot to determine how far away the shooter would have been from the helicopter. Putting this information together, and performing a bit of trigonometry, he estimated the shooter had fired from a distance of about 1630 feet.
Based on all this, Deputy Lindley prepared an affidavit in support of an arrest warrant for Mr. Kerns. In the affidavit, Deputy Lindley explained how Mr. Kerns was a former military marksmanship instructor trained to hit man-sized targets 2100 feet away. The Deputy noted that, by Mr. Kerns’s estimate, the helicopter was less than 1000 feet away at the time it went down. He reported that Mr. Kerns had bragged he could have hit the helicopter with “no problem” and that it was “a great target.” He recounted how Mr. Kerns had made what seemed to be a questionable statement — that he’d heard a loud noise and rocks kick up to his left, even though none of his neighbors reported hearing anything like this and no rock bed could be found in the location Mr. Kerns described. The Deputy also wrote of Mr. Kerns’s suspicious behavior, how he had raced at over one hundred miles an hour in an attempt to lose following detectives. And he reported that a search of Mr. Kerns’s home had yielded several firearms (including the FN rifle); boxes of ammunition; at least one silencer; and a spent shell casing, freshly wrapped in tape and buried in a trash can.
Deputy Lindley’s affidavit also included the results of Koren and Haag’s forensic work. The affidavit explained that, based on Deputy Koren’s calculations, the shooter had been about 1630 feet from the helicopter. Deputy Lindley noted that this was within the range of the FN rifle— and that the distance from where the helicopter was hovering to Mr. Kerns’s house was approximately 1670 feet. Finally, Deputy Lindley reported that the bullet fragment taken from the helicopter could have been fired by the FN rifle.
In light of all this information in Deputy Lindley’s affidavit, an arrest warrant was issued and Mr. Kerns was arrested. A few days later, Mr. Haag and another witness presented much of the same information to a federal grand jury that soon indicted Mr. Kerns.
But then things took a turn. A forensic expert hired by Mr. Kerns found that Mr. *1180 Haag’s ballistics report was sorely mistaken — and soon Mr. Haag admitted that Mr. Kerns’s FN rifle could not have been the one that shot the helicopter. Deputy Koren’s trajectory analysis came into question as well, with competing expert testimony suggesting the shooter had only been 939 feet away, and that the bullet may not have come from the direction of Mr. Kerns’s home. In light of these developments, the U.S. Attorney dismissed the charges against Mr. Kerns.
It was then these lawsuits followed, proceeding in three essential movements. First, Mr. Kerns sued Officers Bader, Thompson, and Carter under 42 U.S.C. § 1983, alleging they had violated his Fourth Amendment rights by briefly entering his house on the night of the crash. Second, he sued Sheriff White, arguing the Sheriffs efforts to obtain his psychiatric records violated his Fourth and Fourteenth Amendment privacy rights. Finally, he accused Deputy Lindley, Deputy Koren, and Mr. Haag of false arrest, false imprisonment, and malicious prosecution. All the defendants moved for summary judgment on the basis of qualified immunity, but the district court denied relief, and the defendants now appeal.[1]
II
We begin our analysis with Officers Bader, Thompson, and Carter, each of whom insists he is entitled to qualified immunity for his role in the search of Mr. Kerns’s house on the night of the crash. Law enforcement officers are, of course, entitled to a presumption that they are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs. “If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit.” Lewis, 604 F.3d at 1230.
A plaintiff can overcome this presumption of immunity only by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity such that “every reasonable official would have understood that what he [was] doing” violated the law. Ashcroft v. al-Kidd, — U.S.-, 131 S.Ct. 2074, 2080, 2083, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted). Failure on either qualified immunity element is fatal to the plaintiffs cause.
In fact, the Supreme Court has recently instructed that courts should proceed directly to, “should address only,” and should deny relief exclusively based on the second element, Camreta v. Greene, — U.S. -, 131 S.Ct. 2020, 2032, 179 L.Ed.2d 1118 (2011), in seven particular circumstances outlined in Pearson v. Callahan, 555 U.S. 223, 236-42, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) — namely when (1) the first, constitutional violation question “is so factbound that the decision provides little guidance for future cases”; (2) “it appears that the question will soon be decided by a higher court”; (3) deciding the constitutional question requires “an uncertain interpretation of state law”; (4) “qualified immunity is asserted at the *1181 pleading stage” and “the precise factual basis for the ... claim ... may be hard to identify”; (5) tackling the first element “may create a risk of bad decisionmaking” due to inadequate briefing; (6) discussing both elements risks “bad decisionmaking” because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (7) the doctrine of “constitutional avoidance” suggests the wisdom of passing on the first constitutional question because “it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.” See also Morgan v. Swanson, 659 F.3d 359, 385 (5th Cir.2011) (en banc).
With respect to the last consideration, constitutional avoidance, the Supreme Court has told us that courts may “avoid avoidance” — and so answer the first qualified immunity question before proceeding to the second — in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is required and the conduct is only likely to be challenged within the qualified immunity regime. Camreta, 131 S.Ct. at 2031 & n. 5. But the Court has also told us that this should be the exception, not the rule — that as a general matter, constitutional avoidance considerations trump and “courts should think hard, and then think hard again, before turning small cases into large ones.” Id. at 2032.
Before the district court the officers argued that Mr. Kerns’s claims fell short on both aspects of the qualified immunity test. They argued that the exigent circumstances posed by the nearby shooting of a police helicopter, coupled with Mr. Kerns’s own statements, justified their fear that a shooter might be hiding out in his home, perhaps even holding hostages. At the least, they insisted, these circumstances justified their brief incursion before they won consent from Ms. Zisser. And even if they did somehow violate the Fourth Amendment, the officers added, they did not violate clearly established Fourth Amendment law. See ApltApp. 90-94. In his opposition to summary judgment, Mr. Kerns understood both prongs of the qualified immunity analysis to be in play and proceeded to explain his view that the officers violated his Fourth Amendment rights, id. at 151-56, as well as why our precedent clearly established that their conduct violated those rights, id. at 148-51. Though the dissent rightly notes the question is close, it ultimately accepts that both aspects of the qualified immunity test were placed in play by the parties before the district court.
Despite this, however, the district court did not analyze the clearly established law element. Instead, the court held only that the defendants had actually violated Mr. Kerns’s Fourth Amendment rights, and from this holding it proceeded directly to the conclusion that they were not entitled to qualified immunity. In other words, the district court’s opinion addressed only the first part of the two part test for qualified immunity.
What to do when the district court fails to address the second, clearly established law, element? If it were clear that no constitutional violation took place, as the defendants urge, we might simply reverse the district court and grant qualified immunity. But the answer to that question isn’t so clear in this case. Faced with that problem we usually do well — as Pearson and Camreta remind us — to proceed directly to the clearly established law question when we’re sure it yields immunity anyway. But there again the answer isn’t so obvious in this case. So it is that we are left in a situation without obvious answers to either qualified immunity ques *1182 tion and risk confronting difficult constitutional questions without the benefit of a full analysis from the district court.
In these circumstances, there remains, however, another course available to us— remanding the matter back to the district court to finish the work of answering the second qualified immunity question. See Distiso v. Town of Wolcott, 352 Fed.Appx. 478, 482 (2d Cir.2009) (unpublished) (“When a district court gives only cursory treatment to the immunity defense, [we] will remand to the district court with instructions to give further consideration to the matter.”) (internal quotation omitted). That course bears the advantage of allowing the adversarial process to work through the problem and culminate in a considered district court decision, a decision that will minimize the risk of an improvident governing appellate decision from this court. And that course is especially prudent where, as here, the issue is close and the briefing on appeal less than entirely satisfactory. Indeed, many of the same considerations that Pearson and Camreta identify as counseling in favor of proceeding directly to the second qualified immunity element — the possibility of avoiding a needless constitutional question, the quality of briefing, and the desire to avoid the risk of a poor decision — also counsel in favor of remanding to ensure the district court addresses the second element before we begin to tangle with a case on appeal. And it is for these very reasons that we reserve decision on both aspects of the qualified immunity question in this case until after the district court, on remand, has finished its work on the clearly established law prong.
Our dissenting colleague proceeds to reach the questions we think prudent to defer, offering views on both prongs of the qualified immunity analysis. He does so in part because he reads the district court’s opinion as having already addressed the clearly established law question in two passages. We regret we are unable to agree. First, the dissent cites the background section of the district court’s order where it simply recites the familiar two prong qualified immunity test without applying it to this case. See ApltApp. at 217. We don’t doubt the district court exhaustively recited the second qualified immunity question. The problem is the court didn’t proceed to answer it. Second, the dissent points to a single sentence in the district court’s self-described “analysis” section (a single sentence out of a four page section). But that sentence says simply this: “The Kerns[es] have a Fourth Amendment expectation of privacy in their own home that is well-established. See Payton v. New York, 445 U.S. at 585, 100 S.Ct. 1371.” See Aplt.App. at 220. By its own terms, that sentence doesn’t purport to issue any holding on the second qualified immunity question. It does not, for example, state that the officers violated the clearly established right it identified or explain how they did so.
But even if the dissent’s reading were correct and the district court’s formulaic statement of a general legal proposition was intended as a holding on the clearly established law question, it is simply inadequate to that task. Of course, Mr. Kerns (like everyone else) has a well-established privacy interest in his home. But the Supreme Court and we have explained that, when it comes to deciding the second qualified immunity question, it is “not enough to look at,” and declare a law enforcement officer liable, based on such “generalized principles.” Medina v. City and County of Denver, 960 F.2d 1493, 1497-98 (10th Cir.1992) (citing Anderson v. Creighton, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Supreme Court vigorously underscored the *1183 point recently, reminding us with some apparent exasperation that it has “repeatedly told courts ... not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.” Ashcroft, 131 S.Ct. at 2084 (internal citations omitted). Instead, for any court to reach a determination that a violation of clearly established law has taken place a “more particularized” inquiry is required. Anderson, 483 U.S. at 640. The court must ask whether “every reasonable official would have understood that what he [did] violate[d] that right.” Ashcroft, 131 S.Ct. at 2083 (emphasis added) (quotation omitted). To satisfy this standard, “[w]e do not require a case directly on point,” but neither may a district court deny immunity unless “existing precedent [has] placed the statutory or constitutional question beyond debate.” Id. (emphasis added).
The relevant question the district court needed to address, thus, wasn’t whether we all have some general privacy interest in our homes (of course we do). It was instead whether it was beyond debate in 2005 that the officers’ entry and search lacked legal justification. In addressing this question the district court needed to address the officers’ claim that exigent circumstances existed (based on a belief that someone who had just shot down a police helicopter might be hiding in or near the home) and their claim that their intrusion was justified in part because of the consent Ms. Zisser supplied (at least after the incursion was first made). And these questions the district court simply left unanalyzed.
Ill
We turn next to the case against Sheriff White. Before the district court, Mr. Kerns argued that the Sheriff violated his clearly established Fourth and Fourteenth Amendment rights by asking the VA hospital to share its records concerning Mr. Kerns’s treatment. To be exact, Mr. Kerns didn’t argue that he owned the hospital records. See Daniel J. Gilman & James C. Cooper, There is a Time to Keep Silent and a Time to Speak, the Hard Part is Knowing Which is Which: Striking the Balance Between Privacy Protection and the Flow of Health Care Information, 16 Mich. Telecomm. & Tech. L.Rev. 279, 309 (2010) (explaining that health care providers generally own patient records). Neither did he seek to hold anyone liable for violating state or federal statutes seeking to ensure some degree of privacy in patient records. See, e.g., Health Insurance Portability and Accountability Act (HIPAA), Pub.L. 104-191, 110 Stat.1936 (1996). Instead, Mr. Kerns submitted only that, whoever owned the records and whatever other laws may say about how and when they might be shared with law enforcement, he had a constitutionally protected expectation that the hospital would keep its records shielded from the Sheriff absent a warrant.
The district court analyzed both aspects of the qualified immunity test before agreeing. On appeal, the Sheriff disputes whether he violated Mr. Kerns’s constitutional rights by asking a hospital to share its records voluntarily — and, if he did, whether those rights were clearly established at the time. Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) *1184 risk of reaching an improvident decision on these vital questions.
We begin with Mr. Kerns’s Fourth Amendment claim, because it provides the more “explicit textual source of constitutional protection” against law enforcement searches. County of Sacramento v. Lewis, 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quotation omitted). At step two of the qualified immunity analysis, the question before us is whether Mr. Kerns can show that Sheriff White’s request to a third party (the hospital) for records that it may own but in which Mr. Kerns claims a privacy interest (an interest which we accept exists for our purposes at step two) violated clearly established Fourth Amendment law as of 2005.
He cannot. In Douglas v. Dobbs, 419 F.3d 1097 (10th Cir.2005), this court accepted that a patient has a privacy interest in medical records held by a third party medical services provider. At the same time, however, the court proceeded to explain that statutes requiring disclosure of those records to “law enforcement” may not always violate the Fourth Amendment. Id. at 1102 n. 3. And then, in language directly pertinent here, the court added that the question whether, in the absence of such a statute, “a warrant is required [for law enforcement] to conduct an investigatory search of [medical] records [held by a third party] ... is an issue that has not been settled.” Id. at 1103. Given this court’s express recognition of the uncertain state of the law in 2005 regarding the very circumstances we now face, we are hardly in a position to say that the proper resolution of the issue was simultaneously beyond doubt. See also Herring v. Keenan, 218 F.3d 1171, 1173 (10th Cir.2000) (recognizing “a constitutional right to privacy” in medical records but granting qualified immunity because no clearly established law put defendant on notice that his conduct violated that right).
Complicating the Fourth Amendment analysis in this case is the role of third party doctrine. Under that doctrine, “the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to Government authorities, even if the information is revealed [to the third party] on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.” United States v. Miller, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The Supreme Court has already applied third party doctrine to financial information, holding that the government may seek without a warrant confidential information clients have entrusted to their banks for safe keeping. Id. And at least some courts have indicated the same analysis applies to personal medical records entrusted by patients to hospitals or care providers — allowing law enforcement to seek without a warrant medical records held by third parties. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.7(d) (4th ed. 2004) (collecting authority). While there’s certainly room to debate whether and how third party doctrine should apply to medical records, see, e.g., Poornima L. Ravishankar, Comment, Planned Parenthood is Not a Bank: Closing the Clinic Doors to the Fourth Amendment Third Party Doctrine, 34 Seton Hall L.Rev. 1093 (2004); United States v. Warshak, 631 F.3d 266 (6th Cir.2010) (declining to extend Miller to ISP records), and while we in no way prejudge these questions, the fact that a live (and heated) debate exists on them is more than enough to preclude us from saying that the Sheriff violated clearly established law when he sought *1185 records held by a third party care provider.
In an effort to shoulder his burden of showing otherwise, Mr. Kerns depends principally on Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). But in that case the Supreme Court expressly declined to answer the question posed in this one. Ferguson held that state hospital employees conducted an unlawful search in violation of the Fourth Amendment by taking urine samples from pregnant mothers without their consent in order to test them for cocaine and provide the results to law enforcement for use against the patients. Id. at 77, 84-85, 121 S.Ct. 1281. In reaching its result, the Court took care to emphasize that the only search at issue was the taking and testing of urine for police use. See id. at 78 n. 13, 121 S.Ct. 1281. The Court expressly left open whether disclosure of preexisting medical records held by the hospital would also be a search implicating the Fourth Amendment. Id. at 77 n. 9, 121 S.Ct. 1281. In fact, the Court even acknowledged that in some situations a patient might well “expect that members of the hospital staff might turn over evidence” without his or her consent. Id. at 78 n. 13, 121 S.Ct. 1281. And after the Supreme Court remanded the case to the Fourth Circuit, that court, too, held only that the hospital’s nonconsensual “taking and testing” of urine for law enforcement purposes was an unlawful search, and again expressly declined to decide “whether the disclosure of test results to law enforcement also implicate[s] the Fourth Amendment.” 308 F.3d 380, 395 (4th Cir.2002). According to the terms of Ferguson itself, then, it hardly placed the Fourth Amendment question before us beyond debate. Underscoring our conclusion, Professor LaFave has explained that Ferguson cannot be taken as having “disapprov[ed] of the result in cases” applying third party doctrine to medical records and finding no Fourth Amendment violation where (as here) a law enforcement officer seeks medical records held by third party care givers. LaFave, Search and Seizure § 2.7(d).[2]
Turning to the Fourteenth Amendment, the same sort of problems recur. In Douglas, this court examined Fourteenth as well as Fourth Amendment case law before concluding that a warrantless request for third party-held records did not violate clearly established law as of 2005. 419 F.3d at 1101-03. And, again, we are hardly able to say otherwise now. It is also unclear whether and to what degree the Fourth Amendment’s third party doctrine might — or might not — also inform the parameters of a patient’s Fourteenth Amendment’s privacy interest in third party medical records. See, e.g., Lewis, 523 U.S. at 841, 118 S.Ct. 1708 (noting that the Supreme Court is “reluctant to expand the concept of substantive due process ... where a particular Amendment [like the Fourth already] provides an explicit textual source of constitutional protection”) (quotation omitted).
*1186 Confirming the lack of a clear answer here, most of the Fourteenth Amendment cases Mr. Kerns cites involve state actors who publicly disclosed a citizen’s private information, not law enforcement officers who requested the voluntary production of records held by a third party for use in legitimate law enforcement efforts.[3] And the Supreme Court in Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), a case which Mr. Kerns seeks to rely upon, suggested a meaningful constitutional difference may exist between these situations, indicating that access by the government without a concomitant public disclosure “does not automatically amount to an impermissible invasion of privacy.” Id. at 600, 602, 97 S.Ct. 869. Repeating the point last term, the Supreme Court revisited Whalen and held that the government’s mere collection of information didn’t violate an assumed privacy interest when the information was sufficiently protected against public disclosure. See NASA v. Nelson, — U.S.-, 131 S.Ct. 746, 761-62, 178 L.Ed.2d 667 (2011).
To be sure, Mr. Kerns cites two cases in which this court held that government officials violated plaintiffs’ substantive due process privacy rights by accessing their records without public disclosure. But both of those cases involved another element not present here: the government officials involved accessed the plaintiffs’ confidential information as part of an unlawful campaign of sexual harassment.[4] Obviously, that situation isn’t present here; there is no dispute that Sheriff White was pursuing what was an otherwise lawful investigation. Neither is this point of distinction clearly immaterial. The cases on which Mr. Kerns relies are consistent with the logic of the common law privacy torts — accessing confidential medical information for the purpose of sexual harassment is exactly the sort of “highly offensive” conduct that might give rise to the tort of intrusion upon seclusion. See Restatement (Second) of Torts § 652B (1977). Meanwhile, it’s less than clear that an officer’s requesting a suspect’s medical records for legitimate law enforcement purposes would meet this same standard. Cf. Setzer v. Farmers Ins. Co., Inc., 185 Fed.Appx. 748, 755 (10th Cir.2006) (unpublished) (insurance company’s conduct was not “highly offensive to a reasonable person” when the company made a general request for medical records with consent for a disclosure of only limited information). Our cases simply don’t speak to that question, let alone do so clearly.
Of course, a case on point isn’t required if the impropriety of the defendant’s challenged conduct is clear from existing case law. If we could be sure that the distinc *1187 tion between public disclosure or government access without a valid purpose, on the one hand, and more limited government access for otherwise legitimate purposes, on the other, is a trivial one we would rule in Mr. Kerns’s favor. See Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (“general statements of the law are not inherently incapable” of satisfying the second prong of the qualified immunity test) (quotation omitted). The difficulty is that the Supreme Court in Whalen and NASA and the logic of our own cases preclude such a conclusion and acknowledge instead that such a distinction might make a constitutional difference.
The dissent eloquently argues that if the scope of Mr. Kerns’s Fourth and Fourteenth Amendments rights in third party held medical records isn’t clear enough then we should use this case to address .the matter definitively. But to voice this argument is to confirm that the issue we confront today hasn’t yet been clearly resolved — and why qualified immunity is unavoidable. The Supreme Court has warned us that small qualified immunity appeals are rarely the right place to decide large new issues of constitutional law. We always do well to abide its warnings. And perhaps especially so here, where the Fourth and Fourteenth Amendment questions surrounding medical records are complex, the third party overlay adds another dimension to the problem, the parties’ briefing unhelpfully skates past many of the important issues, and the lack of clearly established law is readily apparent from our case law and that of the Supreme Court. So it is we leave the bigger questions for another day and today rest our decision on a much humbler premise, reversing the district court’s entry of summary judgment against Sheriff White and ordering the entry of summary judgment in his favor only because Mr. Kerns has failed to identify clearly established law rendering beyond debate that the Sheriffs conduct was unlawful as of 2005.[5]
IV
Finally we turn to Mr. Kerns’s false arrest, false imprisonment, and malicious prosecution claims against Deputy Lindley, Deputy Koren, and Mr. Haag. Although these torts require Mr. Kerns to prove a variety of different elements, and although defendants pursue various qualified immunity arguments in their respective appeals, there is at least one piece of common ground. To prove any of his claims, Mr. Kerns acknowledges he must establish that his arrest and detention were without probable cause. And, in the defendants’ view, this he cannot do because whatever mistakes, omissions, or misstatements they may have made in connection with the arrest warrant affidavit or in grand jury proceedings, there was still probable cause to arrest and detain him during the period of his prosecution. With this much we agree, and we proceed to uphold the defendants’ claim of qualified immunity on this basis because doing so turns out to be the easiest and most economical way to resolve their various appeals. See Pearson, 555 U.S. at 236, 129 S.Ct. 808 (“[Tjhere are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the ‘clearly established’ prong.”).
*1188 Procedurally we approach the probable cause question this way. Where false statements are alleged to have been included in an arrest warrant affidavit or grand jury testimony, “probable cause is determined by setting aside the false information and reviewing the remaining” truthful facts. Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir.1996). Similarly, where true information has been allegedly and unlawfully omitted from an affidavit or grand jury proceeding, the existence of probable cause is determined “by examining the affidavit [or proceedings] as if the omitted information had been included and inquiring if the affidavit [or proceedings] would still have given rise to probable cause.” Id. (internal quotation omitted); see also Taylor v. Meacham, 82 F.3d 1556, 1562 (10th Cir.1996).
Substantively, the question whether probable cause existed in light of the— so defined — factual record does not require proof beyond reasonable doubt. It does not even require the suspect’s guilt to be “more likely true than false.” Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); see also United States v. Ludwig, 641 F.3d 1243, 1252 (10th Cir.2011). Instead, the relevant question is whether a “substantial probability” existed that the suspect committed the crime, Taylor, 82 F.3d at 1562, requiring something “more than a bare suspicion.” Ludwig, 641 F.3d at 1252 (quoting United States v. Garcia, 179 F.3d 265, 269 (5th Cir.1999)).
Evaluated using this technique— striking the allegedly false information and inserting the allegedly truthful but omitted information — and in light of this substantive standard — requiring more than a bare suspicion but not proof beyond a reasonable doubt or even a preponderance — the affidavit and grand jury testimony still featured sufficient evidence to warrant Mr. Kerns’s arrest and detention.
We begin with what was included in the affidavit and isn’t challenged by Mr. Kerns before this court. Mr. Kerns admitted to police that he was looking at the helicopter and “annoyed by it” at the time it was shot. He was trained both as a military marksmanship instructor and as a helicopter mechanic. He bragged to police that the helicopter made “a great target,” that he could have “made that shot,” and that the helicopter’s strobe lights had given him an indication of the helicopter’s flight path. Mr. Kerns behaved suspiciously from the night of the shooting straight through to his arrest. At one point he led detectives on a high speed car chase. (It is true that the police wei'e in an unmarked vehicle and Mr. Kerns admitted only after his arrest that he suspected the car belonged to the police all along, but the police (understandably) thought the behavior suspicious at the time it occurred.) At other points he gave questionable statements to police — no one else reported hearing a gunshot near his house, and police never found the rocks Mr. Kerns said he heard kicking up next to him. And even granting, as Mr. Kerns contends, that Mr. Haag should have excluded the FN rifle and with it the spent shell casing in the trash as the one responsible for downing the helicopter, it is uncontroverted that the tape concealing the casing was fresh and new — again suggesting that Mr. Kerns was attempting to hide something peculiar.
All this taken together was enough to give police substantial if not incontrovertible reason to believe that Mr. Kerns was responsible for the shooting. Indeed, other courts have found probable cause in circumstances analogous in various ways to those presented by this case. See, e.g., United States v. Mills, 280 F.3d 915, 921 (9th Cir.2002) (defendant’s dubious state *1189 ments about presence near remote crime scene and officer’s knowledge of defendant’s criminal history sufficient for probable cause to arrest); Tom v. Voida, 963 F.2d 952, 958-59 (7th Cir.1992) (discussing flight as a “relevant and probative factor” in probable cause analysis and holding that flight from an officer “may certainly provide information to ripen an officer’s preexisting suspicions into probable cause”); Husbands ex rel. Forde v. City of New York, 335 Fed.Appx. 124, 127 (2d Cir.2009) (unpublished) (probable cause to arrest for shooting where officer heard shots suddenly fired, saw individual standing alone in the direction where the shots were fired, individual immediately turned around and proceeded in the direction from which the shots had come); Young v. Renico, 346 Fed.Appx. 53, 58-59 (6th Cir.2009) (unpublished) (probable cause to detain defendant suspected for murder of his wife and son where police had information suggesting defendant’s motive and defendant had told doctors to immediately remove his son from life support after learning of his condition); see also Johnson v. Schneiderheinz, 102 F.3d 340, 341-42 (8th Cir.1996) (evidence that suspect was in vicinity of the murder and had lied to police about other details created at least “arguable” probable cause to arrest). Neither does Mr. Kerns identify any contrary authority that would lead us to reject a finding of probable cause in light of all the appropriately included facts.
Instead, Mr. Kerns asks us to focus on facts that the affidavit and grand jury testimony omitted, insisting that including those facts would have ruled him out as the shooter — even in light of the facts the affidavit properly contained. And this, he says, is the case for two reasons.
First, he argues (as does the dissent) that if the defendants had disclosed the true location and heading of the helicopter it would have been clear that the shot couldn’t have come from his backyard. But none of this is necessarily exculpatory. It only does Mr. Kerns any good if he can show he was in his backyard at the time of the shooting. But the only evidence of that comes from Mr. Kerns’s self-interested statements. And by the time of his arrest Mr. Kerns had already proved himself unreliable through a variety of misleading and contradictory statements and actions — statements and actions outlined in the arrest warrant affidavit and grand jury testimony. Including the omitted information about the track of the helicopter, thus, would have done nothing to negate the probable cause that already existed.
Second, Mr. Kerns says that, if Mr. Haag had followed the standards of his profession, he would have excluded the FN rifle as the one that shot down the helicopter — and the inclusion of this fact in the arrest warrant affidavit or grand jury proceedings would have negated probable cause to support his arrest and detention. But the difficulty with this line of argument is that nothing in the probable cause analysis we have set forth or the precedents we have discussed depends on the discovery of the weapon responsible for the crime. Even if the police had said that the FN rifle wasn’t involved in the shooting, sufficient other evidence existed to provide probable cause to think Mr. Kerns was the shooter, including Mr. Kerns’s boasting about being able to hit the helicopter, his background, his many questionable statements, and his evasion of police. Each of these facts was known to the officers and does not require any speculation on their behalf. Indeed, probable cause to arrest often arises from circumstantial evidence when the weapon responsible for the crime cannot be found or identified, as the precedents cited above illustrate and confirm.
*1190 The existence of probable cause disposes of all of Mr. Kerns’s claims against all three defendants. For its part, the dissent disagrees with us about the existence of probable cause, but it doesn’t grapple with the authority we’ve cited or offer any of its own. And it proceeds to deny qualified immunity to all three defendants without pausing to address the clearly established law question. To be sure, the dissent appears very concerned by the fact that Mr. Haag’s ballistic analysis and Officer Koren’s trajectory analysis seem to have been faulty and perhaps even recklessly so. And, to be equally clear, we share that concern. Of course and emphatically, when assessing the existence of probable cause we must exclude such false or reckless information and include any suppressed material exculpatory information. But we have done exactly that and the fact remains, at the end of the process, enough truthful information existed in the arrest warrant and grand jury proceedings to establish probable cause. And because of that we remain obliged by law to extend qualified immunity.[6]
* *
The district court’s order denying qualified immunity with respect to Mr. Kerns’s Fourth Amendment claim against Officers Bader, Thompson, and Carter, is vacated and that matter is remanded for further proceedings consistent with the guidance provided above. The district court’s order denying qualified immunity with respect Mr. Kerns’s claims against Sheriff White, Deputy Lindley, Deputy Koren, and Mr. Haag, is reversed and the court is directed to grant dismissal to these defendants on the basis of qualified immunity. We have no occasion to reach the defendants’ other arguments as to why they should be entitled to absolute or qualified immunity. Similarly, Deputy Lindley’s and Deputy Koren’s argument that the district court ruled on their summary judgment motion prematurely is mooted by our reversal in their favor.

. Mr. Kerns acknowledges that a district court’s denial of summary judgment on grounds of qualified immunity is subject to immediate review when the issues appealed are ones of law. But he cautions us that the defendants’ arguments sometimes seem to him to be rooted in disputed factual issues which are not subject to interlocutory review. We proceed mindful of this constraint on our jurisdiction and limit the scope of our inquiry to legal challenges to the court’s denial of qualified immunity. See Lewis v. Tripp, 604 F.3d 1221, 1225-26 (10th Cir.2010).

. Alternatively, Mr. Kerns directs us to a pair of Tenth Circuit cases in aid of his Fourth Amendment claim. First, he finds hope in Lankford v. City of Hobart, 27 F.3d 477 (10th Cir.1994), where this court said "it is possible” a Fourth Amendment violation had occurred under somewhat similar circumstances. Id. at 480 n. 2. For its part, the dissent also relies extensively on Lankford. See Dissent at 1198-99. But whatever else one wants to say about that decision, its language hardly announced "clearly established law.” At best, Lankford's equivocation declined to foreclose the possibility of a Fourth Amendment violation. Likewise, we reject Mr. Kerns's suggestion that the out-of-circuit concurrence in United States v. Abrams, 615 F.2d 541 (1st Cir.1980), clearly established that Sheriff White's conduct was unlawful.

. See, e.g., A.L.A. v. West Valley City, 26 F.3d 989, 990 (10th Cir.1994) (considering claims arising from "disclosure of [] confidential medical information”) (emphasis added); Stidham v. Peace Officer Standards & Training, 265 F.3d 1144, 1155 (10th Cir.2001) ("interest in avoiding disclosure of personal matters”) (emphasis added) (quotation omitted); Flanagan v. Munger, 890 F.2d 1557, 1570 (10th Cir.1989) (“[T]he constitutional right to privacy protects an individual's interest in preventing disclosure by the government of personal matters.”) (emphasis added); Mangels v. Pena, 789 F.2d 836, 839 (10th Cir.1986).

. See Lankford, 27 F.3d at 478; Eastwood v. Dep’t of Corr., 846 F.2d 627, 629-30 (10th Cir.1988). These cases are explicitly directed at "protecting employees’ private information from being obtained by their employers without a valid reason.” See Lankford, 27 F.3d at 479 (emphasis added); Eastwood, 846 F.2d at 631 (10th Cir.1988) (the Fourteenth Amendment “protects the individual from governmental inquiry into matters in which it does not have a legitimate and proper interest”).

. Neither do we doubt that the scope of the Constitution's protection for a patient’s hospital records can be adequately decided in future cases where the qualified immunity overlay isn’t in play (e.gthrough motions to suppress wrongly seized records or claims for injunctive or declaratory relief).

. Mr. Kerns (but not the dissent) suggests that the U.S. Attorney's decision to drop criminal charges against him after Mr. Haag admitted error proves that probable cause depended on Mr. Haag’s testimony. But this conflates two logically different questions. A prosecutor’s decision not to proceed to trial where proof beyond a reasonable doubt is required does not necessarily prove that a prior indictment lacked probable cause. Separately, Mr. Kerns notes that Deputy Lindley’s affidavit overstated the certainty that the recovered bullet fragments were consistent with ammunition found in Mr. Kerns’s house. But he doesn’t argue that this statement was actually false, and the link between Mr. Kerns's ammunition stash and the bullet fragments is, again, unnecessary to establish probable cause.