# United States Court of Appeals
## For the First Circuit

No. 13-2138

PABLO JAVIER RIVERA-CORRALIZA, on his own behalf and as
President of PJ ENTERTAINMENT, INC.; CARLOS CRUZ-ALVERIO; JAIME
RODRÍGUEZ-VEGA; ELLIS LINFERNAL-CRUZ, on his own behalf and as
President of the ASOCIACIÓN DE OPERADORES DE MÁQUINAS DE
ENTRETENIMIENTO DE ADULTOS DEL OESTE, INC.; RICARDO HERNÁNDEZ-
ECHEVESTRE on his own behalf and as President of RICARDO'S
ENTERTAINMENT CORP.,

Plaintiffs, Appellants,

v.

JUAN CARLOS PUIG-MORALES; AILEEN DE LEÓN-GARCÍA; VÍCTOR R.
PÉREZ-PILLOT; ZULMA I. RIVERA-GÓMEZ; DAVID CARABALLO-MALDONADO;
MARÍA C. MEDINA-ORTIZ; ABIMAEL RODRÍGUEZ-LÓPEZ; ALFREDO E.
PÉREZ-RIVERA; HÉCTOR O. GADEA-RIVERA; RAFAEL A. DIEZ DE ANDINO;
MILTON VESCOVACCI-NAZARIO; MARISOL FLORES-CORTÉS; JOHN DOE I-XX,
all in their personal capacities,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Thompson, Circuit Judges.

Christian J. Francis-Martinez, with whom José J. Gueits-Ortiz and Francis & Gueits Law Offices, PSC, were on brief, for appellants.

Susana I. Peñagarícano-Brown, Assistant Solicitor General, Department of Justice, with whom Margarita L. Mercado-Echegaray, Solicitor General, was on brief, for appellees.

July 22, 2015

**THOMPSON**, <u>Circuit Judge</u>.

**Overview**

Ticked off that agents of the Puerto Rico Treasury Department had seized their "adult entertainment machines" ("AEMs," to save keystrokes), today's plaintiffs sued the supposedly responsible parties for damages under 42 U.S.C. § 1983, alleging (as relevant here) violations of the First, Fourth, and Fourteenth Amendments as well as several commonwealth laws. The district court granted defendants summary judgment on the federal claims and dismissed the commonwealth claims without prejudice. And plaintiffs are now here asking us to undo the court's ruling. Agreeing with some of what they say, we vacate in part, affirm in part, and remand for further proceedings. We will explain our thinking shortly. First, the facts, which we present in the light most favorable to plaintiffs (the summary-judgment losers), drawing all supportable inferences in their favor. <u>See</u>, <u>e.g.</u>, <u>Soto-Padró</u> v. <u>Pub. Bldgs. Auth.</u>, 675 F.3d 1, 2, 5 (1st Cir. 2012).

**Background**

<u>Games People Play</u>

Plaintiffs hold licenses from the Puerto Rico Treasury Department ("Treasury," for short) authorizing them to own and operate AEMs. Plaintiffs are also members of "EMPRECOM," a

- 3 -

business association of AEM owners.[1]  AEMs are nothing more than coin-operated arcade-game-like machines found in small businesses (liquor stores, gas stations, etc.) that are not supposed to award cash prizes (winners get bonus games) — which makes AEM games different from gambling machine games (more on this later).[2]  But unscrupulous owners (we are told) occasionally convert AEMs into illegal gambling machines (say, for instance, slot machines), which is a major worry for Treasury.

According to plaintiffs (whose account we accept for purposes of summary-judgment review), here is how the suit arose:

Sometime in early 2009 — possibly in February or March (the record is not exactly clear) — plaintiff Pablo Javier Rivera-Corraliza (EMPRECOM's president) met with Treasury Secretary (and defendant) Juan Carlos Puig-Morales, a big backer of a movement to install video-lottery terminals islandwide; as we understand it, these terminals are noncasino gaming machines that would connect to a system designed to collect tax revenue.  Anyway, the two had a friendly conversation about issues affecting AEMs.  They, for example, touched on a bill pending in the Puerto Rico legislature

---

[1] EMPRECOM is the Spanish acronym for the "Puerto Rican Commercial Recreation Business."

[2] See generally Sun Design Video v. Puerto Rico, 136 P.R. Dec. 763 (1994) (certified English translation, slip op. at 11-18) (discussing the differences).

that would require that all AEMs connect to a central system at Treasury for monitoring purposes. And they talked about Puig-Morales's desire to go after AEM operators holding forged licenses — something EMPRECOM applauded.

But Puig-Morales was anything but friendly at a follow-up meeting the next month, telling Rivera-Corraliza point blank that every AEM was "illegal" and had to be "confiscated." Hold on, said Rivera-Corraliza, Treasury had issued "8,000" AEM permits yet there are roughly "14,000" AEMs "out on the streets" — just go after the fake-license holders, he implored Puig-Morales. "We'll see about that" was Puig-Morales's reply.

Treasury started seizing AEMs around this time. But none belonged to plaintiffs — Treasury did not start seizing theirs until February 2010, as we will soon see.

Around the spring of 2009 (the record does not reveal when) Puig-Morales told plaintiff Jaime Rodríguez-Vega (EMPRECOM's treasurer) that AEM owners should exchange their machines for the video-lottery machines of Caribbean Cage, Inc., a company that specializes in gaming systems. Puig-Morales promised to stop the seizures if they made the switch to Caribbean Cage's machines. And Puig-Morales said essentially the same thing to Rivera-Corraliza, telling him that AEM owners would not have to worry about seizures if they "signed up" with Caribbean Cage.

So Rivera-Corraliza inked a deal with Caribbean Cage on behalf of EMPRECOM (when, we do not know). Under the agreement, EMPRECOM members were to provide the venues for the video-lottery terminals. And Caribbean Cage promised to pay any fees EMPRECOM members might owe Treasury.

In August 2009 Puig-Morales issued a letter of intent to negotiate with Caribbean Cage about installing video-lottery terminals islandwide. For this to work, though, EMPRECOM and its members had to be on board, as Puig-Morales well knew. But EMPRECOM members became distinctly unhappy when Puig-Morales told EMPRECOM representatives during that same month that they had to pay a $2,250 license fee for each video-lottery machine. And when EMPRECOM members balked, Puig-Morales slammed his hand on a desk and screamed that they had until the end of the day to resolve the problem — and if they did not, then all their AEMs would "disappear." Ultimately (for reasons this record does not illuminate) the deal between EMPRECOM and Caribbean Cage fell through and Treasury installed no video-lottery terminals anywhere.

Shortly after the table-slamming meeting, Puig-Morales went on a media campaign to trash AEM owners (the record does not indicate precisely when the offensive started, though). He told one interviewer, for example, that he "hated" AEMs and favored

installing video-lottery terminals throughout Puerto Rico (plaintiffs have not told us when he said this). He told another interviewer that all AEMs were "illegal" (plaintiffs have not told us when he said that). And he told a third interviewer in February 2010 (finally, a date!) that he was going to "eliminate" the AEM industry because neither the governor nor the public supported AEMs. Not willing to take Puig-Morales's attacks lying down, Rivera-Corraliza also gave interviews to the media in which he defended AEM owners — though the record evidence plaintiffs point us to does not say how many interviews he gave and when.

In late 2009 or early 2010 Puig-Morales appointed defendant Abimael Rodríguez-López head of a special Treasury task force charged with dealing with AEMs. When Rodríguez-López was absent, then defendant Alfredo Pérez-Rivera was in charge. Agents on the task force — like defendant Victor Pérez-Pillot, for example — took an eight-hour course in how to inspect AEMs for illegalities. And they went about inspecting AEMs this way (Treasury had no manuals or guidelines covering how to inspect AEMs):

Task-force agents identified businesses with AEMs. And once they got the go-ahead from Rodríguez-López, they would inspect the AEMs, examining the licenses and then the machines themselves — even if the licenses checked out. In fact, even if the AEMs'

exterior looked okay, agents would ask the businesses' owners to unlock the machines, and if the owners refused, agents would break the locks open — simply on Rodríguez-López's say-so, even without probable cause or a search warrant.

Defendants Milton Vescovacci-Nazario and Marisol Flores-Cortés — two outside lawyers Puig-Morales had hired to remind agents about the dos and don'ts of AEM inspections — signed off on the lock-breaking protocol around February 2010. And Puig-Morales signed off on the entire seek-and-find procedure. Another high-ranking Treasury official — defendant Héctor O. Gadea-Rivera — let task-force agents conduct inspections as they had been doing before he came on board on July 1, 2010. And still another — defendant Rafael Diez de Andino — also signed off on the inspection procedure when he became a deputy director at Treasury on September 15, 2010, or so plaintiffs claim.[3] But before that, Diez de Andino (who was at Treasury, though we're not sure what his title was) had a hand (at least as early as February 2010) in telling agents which businesses to inspect.

Rivera-Corraliza is not only EMPRECOM's president; he is also president of PJ Entertainment, Inc., a corporation that owned AEMs. Early in the morning of February 26, 2010, he got a call

---

[3] We say "claim" because the record citations in their brief say nothing to support the point.

from the owner of a liquor store — which was then closed — saying that task-force agents were seizing some of PJ Entertainment's AEMs without a warrant. The store was not on the list of businesses to be inspected that day. But Diez de Andino had ordered Pérez-Pillot to go there.

Rivera-Corraliza got to the scene lickety-split. Just then, Puig-Morales reached him on his cell phone. "How are the guys behaving?" Puig-Morales asked. Pérez-Pillot "wants to take the machines" Rivera-Corraliza explained, to which Puig-Morales replied, "Good fellow, good fellow" (referring to Pérez-Pillot). Agents claimed the seized AEMs had "knock-off switches" — i.e., devices that make it possible for players to redeem winnings and for the operators to reset the machines. See 15 L.P.R.A. § 82(3) (part of the "Games of Chance Act"). A knock-off switch is a telltale sign of illegal gambling machines. See id. But Rivera-Corraliza insists that none of his company's AEMs had a device like that. And when he got to inspect the AEMs months later he allegedly saw that the games had been changed and that some were broken.

Over the next few months task-force agents (including some of the defendants named here) seized more AEMs belonging to PJ Entertainment as well as AEMs belonging to the remaining

plaintiffs.[4]  Here is how plaintiffs paint the picture:  Agents inspected AEMs without warrants, sometimes when the stores were closed.  Agents checked out an AEM's interior even if the license seemed in order, breaking the AEM's lock if the owner refused to open the machine.  Agents then confiscated AEMs, contending that the machines had been altered to run like illegal gaming machines — one plaintiff claims that an agent, defendant Aileen de León-García, told him that she found nothing illegal after looking inside his AEMs, but defendant Rodríguez-López had ordered her to take the AEMs anyway for further investigation.  And when plaintiffs later inspected the AEMs, they saw that the machines had been broken or damaged.[5]  Puig-Morales told agents to fine only AEM owners for any illegalities, not the owners of the businesses housing the AEMs (we will call these "establishment owners" the

---

[4] The exact dates are:  May 12, 2010; May 24, 2010; June 29, 2010; July 22, 2010; August 7, 2010; August 24, 2010; August 27, 2010; September 27, 2010; and December 2, 2010.

[5] The parties agree that "months" after the seizures (the record does not say exactly when) someone broke into the warehouse holding plaintiffs' AEMs and damaged or stole the machines' parts. Defendants suggest that the person who broke into the warehouse — and not any inspecting agent — bears responsibility for the AEMs' damage.

rest of the way).[6]  He also told agents to fine the AEM owners $5,000 "per machine."

In mid-to-late 2010 plaintiffs or their companies filed suits in a local court (the Puerto Rico Court of First Instance) challenging the forfeiture of AEMs.  Plaintiffs, however, point us to nothing in the record indicating how the suits turned out.

## Going for Broke

Following these events plaintiffs sued defendants in Puerto Rico's federal district court for money damages under section 1983 — the statute that (at the risk of oversimplification) provides a civil remedy for state action that deprives persons of federal statutory or constitutional rights.  See Klunder v. Brown Univ., 778 F.3d 24, 30 (1st Cir. 2015).  Essentially plaintiffs accused defendants of violating the Fourth Amendment's search-and-seizure provisions by doing baseless inspections and confiscations, infracting the Fourteenth Amendment's due-process clause by not offering predeprivation hearings, and defying the Fourteenth Amendment's equal-protection clause by treating them differently from the establishment owners.[7]  Rivera-Corraliza —

---

[6] Plaintiffs intimate that AEM owners and establishment owners are (at least for present purposes) mutually exclusive groups.

[7] Plaintiffs also alleged that defendants' actions violated the Eighth Amendment's excessive-fines clause — yet another claim the district court dismissed on summary judgment.  Plaintiffs have not

- 11 -

and Rivera-Corraliza only — also accused defendants of retaliating against him for exercising his First Amendment right to free speech. And plaintiffs all asserted supplemental local-law claims, which mirrored their federal-law claims.

After some discovery defendants moved for summary judgment, arguing (among other grounds) that (a) they never violated any of plaintiffs' constitutional rights — but if they had offended plaintiffs' search-and-seizure and due-process rights, they were entitled to qualified immunity — and that (b) they should get judgment as a matter of law on the state claims. Plaintiffs opposed. Taking up the motion, the district court ruled, relevantly, as follows: On the search-and-seizure claim, the court found defendants' actions constitutional — under the administrative-search exception to the warrant requirement — and even if not, defendants were qualifiedly immune because they violated no bright-line rule. And, the court added, given the commonwealth's need to act quickly to protect the public from apparently illegal AEMs, the postdeprivation remedies offered satisfied the minimal requirements of due process. Plaintiffs' equal-protection claim misfired, the court said, because AEM owners and establishment owners are not similarly situated. As

---

argued that the court got that ruling wrong. So we say no more about it.

for Rivera-Corraliza's speech-retaliation claim, the court found he had failed to show how his talking to the press substantially motivated defendants to act as they did. So the court granted defendants summary judgment on the federal-law claims and then relinquished jurisdiction over the local-law claims.

Which brings us to today, with plaintiffs asking us to vacate the district court's judgment and remand for a trial on all claims.

**Important Concepts to Keep in Mind**

Before tackling plaintiffs' arguments, we make a few preliminary comments:

Summary-Judgment Basics

As always, we give fresh review to the district court's summary-judgment ruling, affirming if "there is no genuine dispute as to any material fact" — even after giving plaintiffs the benefit of all reasonable inferences in the record — and defendants are "entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a); see also Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009). And we may affirm a summary judgment on any ground supported by the record, even one not relied on by the court below. See, e.g., Geshke v. Crocs, Inc., 740 F.3d 74, 76-77 (1st Cir. 2014); Boveri v. Town of Saugus, 113 F.3d 4, 6 (1st Cir. 1997).

Qualified-Immunity Basics

The qualified-immunity defense is in play on two claims, don't forget — the search-and-seizure claim and the due-process claim. And to overcome that defense plaintiffs must make a two-step showing — that (a) defendants violated a statutory or constitutional right and that (b) the right was clearly established at the time. See, e.g., City & Cnty. of S.F. v. Sheehan, 135 S. Ct. 1765, 1774 (2015); McGrath v. Tavares, 757 F.3d 20, 29 (1st Cir. 2014). The clearly-established step requires plaintiffs to identify "'controlling authority' or a 'robust consensus'" of "'persuasive authority'" such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal "in the particular circumstances that he or she faced" — then-existing precedent, in other words, "'must have placed the statutory or constitutional question . . . beyond debate.'" Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083, 2084 (2011)); accord Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 9, 10 (1st Cir. 2013). Courts penalize officers for violating "bright lines," not for making "bad guesses in gray areas." See Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992); see also al-Kidd, 131 S. Ct. at 2086-87 (Kennedy, J., concurring) (emphasizing that qualified immunity applies if defendants have no "'fair and clear warning'

of what the Constitution requires" (quoting United States v. Lanier, 520 U.S. 259, 271 (1997))).

If plaintiffs stumble at either step — taken in any order we like, see Pearson v. Callahan, 555 U.S. 223, 236 (2009) — their search-and-seizure and due-process claims go kaput, see Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992) (noting that when a defendant invokes qualified immunity, the burden is on the plaintiff to show the inapplicability of the defense). Also and importantly, judges are free to jump directly to — and decide the case exclusively on — the clearly-established step in certain situations. See Camreta v. Greene, 131 S. Ct. 2020, 2032 (2011). Examples of when judges should follow that course include: if dealing with the constitutional-violation step requires "uncertain assumptions about state law" or creates "a risk of bad decisionmaking" because the briefs are bad; if discussing both steps risks "bad decisionmaking" because the court may believe the law is not clearly established and so give little thought to whether the constitutional right exists; and if the canon of "constitutional avoidance" counsels against focusing on the constitutional-violation step because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Pearson, 555 U.S. 223, 237-41 (2009); accord Kerns v. Bader, 663 F.3d 1173, 1180-81

(10th Cir. 2011) (discussing <u>Pearson</u> and <u>Camreta</u>).  Reduced to simplest terms, "courts should think hard, and then think hard again, before turning small cases into larger ones," <u>see</u> <u>Camreta</u>, 131 S. Ct. at 2032 — sage words, indeed.

Now on to plaintiffs' claims.

**Our Take on the Case**

<u>Search-and-Seizure Claim</u>

First up is plaintiffs' claim that defendants' warrantless searches and seizures violated the Fourth Amendment (applied to Puerto Rico by the Fourteenth).  For their part defendants insist that they are shielded from this claim by qualified immunity, arguing that they acted pursuant to the administrative-search exception to the warrant requirement, meaning they violated no Fourth Amendment right — let alone any clearly-established Fourth Amendment right.

(a)
Administrative Searches

For anyone unfamiliar with administrative searches, here's a quick primer:

The Fourth Amendment protects us from "unreasonable searches and seizures."  <u>See</u> U.S. Const. amend. IV.  It also says that "no Warrants shall issue, but upon probable cause."  <u>Id.</u> Reasonableness is the amendment's central command, however, <u>see</u>

- 16 -

Kentucky v. King, 131 S. Ct. 1849, 1856 (2011), with reasonableness determined by weighing the government's need for the search against the degree of intrusion into a citizen's privacy interests, see, e.g., Camara v. Mun. Court of City & Cnty. of S.F., 387 U.S. 523, 536-37 (1967); Ruskai v. Pistole, 775 F.3d 61, 68 (1st Cir. 2014).

This amendment covers searches of homes and commercial premises, our judicial superiors tell us. See, e.g., City of Los Angeles v. Patel, No. 13-1175, 2015 WL 2473445, at *7 (U.S. June 22, 2015); New York v. Burger, 482 U.S. 691, 699-700 (1987). And staying with commercial premises, we know that because the government has a "heightened" interest in regulating commerce, persons running commercial premises have a lessened expectation of privacy. United States v. Maldonado, 356 F.3d 130, 134-35 (1st Cir. 2004) (citing Burger, 482 U.S. at 700). Yet even when a search is done to enforce a regulatory scheme, a warrant is often required — though in that situation, the "probable cause" of which the Fourth Amendment speaks can be something less than probable cause to believe the law is being violated. See, e.g., Marshall v. Barlow's, Inc., 436 U.S. 307, 320 (1978) (explaining that for administrative-search purposes, "probable cause justifying the issuance of a warrant may be based . . . on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular

- 17 -

[establishment]'" (second and third alterations in original) (quoting Camara, 387 U.S. at 538)).

But because "reasonableness" is the standard, the Supreme Court has approved certain exceptions to the Fourth Amendment's warrant and probable-cause requirements in compelling situations. See, e.g., Brigham City v. Stuart, 547 U.S. 398, 403 (2006); Burger, 482 U.S. at 702. One is for searches of pervasively-regulated businesses. The idea is that "when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation," and thus a warrantless search to enforce that regulatory regime is not unreasonable. Marshall, 436 U.S. at 313.[8] Searches of this sort can affect an infinite number of people and places, obviously. So to stop inspectors from running amok, several things are critical. The first is that the government

---

[8] See also New York v. Burger, 482 U.S. 691 (1987) (automobile junkyard); Donovan v. Dewey, 452 U.S. 594 (1981) (coal mine); United States v. Biswell, 406 U.S. 311 (1972) (gun dealer); Colonnade Catering Corp. v. United States, 397 U.S. 72 (1970) (liquor dealer); United States v. Gonsalves, 435 F.3d 64 (1st Cir. 2006) (drug storage); United States v. Maldonado, 356 F.3d 130 (1st Cir. 2004) (interstate commercial trucking); Blue v. Koren, 72 F.3d 1075 (2d Cir. 1995) (nursing homes); Lesser v. Espy, 34 F.3d 1301 (7th Cir. 1994) (rabbitry); United States v. Chuang, 897 F.2d 646 (2d Cir. 1990) (banking); Shoemaker v. Handel, 795 F.2d 1136 (3d Cir. 1986) (horse racing); Rush v. Obledo, 756 F.2d 713 (9th Cir. 1985) (daycare facilities); Pollard v. Cockrell, 578 F.2d 1002 (5th Cir. 1978) (massage parlors).

have a substantial interest in regulating the business. The next is that warrantless inspections further this interest. And the third is that the regulations offer "a constitutionally adequate substitute for a warrant" by giving notice to those regulated and limiting the inspectors' discretion in "time, place, and scope." Burger, 482 U.S. at 703 (internal quotation marks omitted). Collectively, these factors — a pervasively-regulated business, a substantial government interest in regulating the business, administrative searches that advance this interest, and a regulatory scheme that prescribes alternative safeguards — make up what we call the Burger test.[9]

Judges must never forget that while the Constitution okays warrantless searches in some situations, it never okays unreasonable ones.[10] Also, the Burger test is a carefully-drawn screen that we — and all courts — must jealously protect,[11] lest

_____

[9] See Tart v. Massachusetts, 949 F.2d 490, 498 (1st Cir. 1991); see also Gonsalves, 435 F.3d at 67-68.

[10] See Camara, 387 U.S. at 523, 536-37 (recognizing that the reasonableness of an administrative search depends on "balancing the need to search against the invasion which the search entails").

[11] See generally Jones v. United States, 357 U.S. 493, 499 (1958) (stressing that warrantless searches must fall within one of the narrow "jealously and carefully drawn" exceptions to the Fourth Amendment).

this particular warrantless-search exception destroy the Fourth
Amendment.[12]

(b)<br>Reader Alert

Shifting from the general to the specific, we next talk
about the Burger test in the context of this case, eventually
noting how the district court never explicitly addressed whether
the relevant regulatory regime provides an acceptable warrant
substitute.  The absence of an express analysis here leaves a
critical gap in the qualified-immunity ruling, because the
presence (or not) of an adequate warrant stand-in affects whether
defendants violated plaintiffs' Fourth-Amendment rights and
whether any such rights were clearly established when they acted.
Believing it better to have the benefit of the district court's

---

[12] We need not decide whether Patel — the Supreme Court's most
recent decision dealing with Burger — changed the Burger test in
any way.  That is because the key question for qualified-immunity
purposes is whether the law was clearly established when the
complained-of actions occurred.  See, e.g., Reichle v. Howards,
132 S. Ct. 2088, 2093 (2012) (discussing the state of the law "at
the time of [the] arrest"); al-Kidd, 131 S. Ct. at 2083 (focusing
on whether the law was clearly established "at the time of the
challenged conduct").  Notice — prior notice, not after-the-fact
notice — is what matters, because officers need to know when they
are doing wrong.  See Reichle, 132 S. Ct. at 2093; see also
Plumhoff, 134 S. Ct. at 2023 (stressing that a court need "not
consider later decided cases because they 'could not have given
fair notice to'" the agent (quoting Brosseau v. Haugen, 543 U.S.
194, 200 n.4 (2004))).  And Patel was not around when the events
here went down.

- 20 -

judgment on this vitally-important issue in the first instance, we — for reasons shortly stated — ultimately remand the search-and-seizure matter.

(c)<br>Pervasive Regulations

Our parties spar quite a bit over whether AEMs are part of a highly-regulated undertaking. The test for whether an industry fits that bill is whether the state's regulatory presence is so pervasive that business owners cannot help but know that their commercial properties may be periodically inspected for specific purposes. See Burger, 482 U.S. at 705 n.16. Burger upheld the warrantless inspection of a junkyard's records, permits, and autos. Id. at 693-95. In doing so the Court found that auto junkyards fit within the definition of closely regulated for these reasons: The regulatory scheme required junkyard owners to get licenses and registration numbers from the state; display the registration numbers prominently at the businesses; keep books recording purchases and sales of autos and auto parts; and make the books and autos available for inspection. Id. at 704. Junkyard owners could also get hit with criminal penalties, license

- 21 -

revocation, and civil fines if they failed to comply.  Id. at 704-05.

With this in mind, now consider the following:

- The Games of Chance Act, also called the Gambling Act.  This Act singles out as unlawful all "games of chance."  15 L.P.R.A. § 82.  A familiar example of a game of chance is a slot machine.[13]  Id.  As for AEMs, they are "legal."  Id.  And the Act defines AEMs as "those machines that do not have mechanisms or apparatus that are characteristic of gambling machines . . . ."  15 L.P.R.A. § 82a(a).  The Act says that when AEMs "are located and operated in a business authorized therefor, the permit for their use . . . shall establish that

_____

[13] "Games of chance" are machines that have "any of the following" things:

> (1) An apparatus to accept wagers that are registered on a counter inside the machine.
> (2) A mechanism to award cash prizes to the player, a coin dispenser (hopper) which awards the prize directly to the player, or a meter which can register or credit cash payments to the player.
> (3) A knock-off switch to erase the credits once they are paid to the winning player.
> (4) An apparatus or mechanism that causes the machine to function with total autonomy of the player for a predetermined cycle or space in time and which causes that the result of the game or operation of the machine is decided by chance or luck.

Id. § 82 (1)-(4).

- 22 -

they must be located at a distance of over two hundred (200) meters from a public or a private school or from a church or congregation that seeks spiritual serenity," 15 L.P.R.A. § 83 — a serious operating restriction, for sure. The Act also tells the Treasury secretary to "establish the necessary procedure to ensure that every machine to be authorized as an [AEM] machine is personally evaluated and certified to be an [AEM]" by the appropriate Treasury agents. Id. The Act lets the Treasury secretary hit AEM owners with administrative fines (ranging from $5,000 to $10,000) for each violation of the Act. 15 L.P.R.A. § 84a(a). And the Act makes it a felony for anyone either to prevent agents from inspecting the places for the purpose of conducting investigations under the Act or to admit or encourage persons under age 18 "to operate" AEMs. Id. § 84a(b)(3).

- Treasury Regulation 7437. That regulation — designed to (among other things) implement the provisions of the Games of Chance Act — covers a lot of ground too. To get a flavor of what this provision is about, we note that the regulation deals with things like what documents are needed to get AEM licenses — "criminal background" and "debt" certificates, and "sworn statements" from establishment owners promising not to let persons under 18 use AEMs. It says where to file the

- 23 -

papers — at a district office near the applicant's place of business, for example. It lists the yearly "license fee" for each AEM — $2,250. It mentions how the license must be "available for inspection" by Treasury agents and where AEMs must have identifying "tag[s]" — on their "upper right side." And it discusses when the Treasury secretary "may deny, suspend or revoke" a license — if, for instance, a license holder or its representative prevents the secretary from inspecting the place of business or examining the relevant "documents, books, records or reports." See P.R. Treas. Reg. 7437, arts. 2040-1, 2044-1 (certified English translation, at 3-9, 21-26).

- The Internal Revenue Code. The Code empowers the Treasury secretary to examine "documents, assets," and "inventories" tied to "activities subject to the taxes and fees" under the commonwealth's internal revenue code and to also "[s]eize and sell at public auction or destroy . . . any . . . device whose operation is illegal" under "the Games of Chance Act." See 13 L.P.R.A. § 8140(a)(1), (7)(G).[14]

---

[14] Section 8140 was in vogue at the time of the events in issue. The Puerto Rico legislature repealed that section in 2011 and replaced it with a basically-similar section, 13 L.P.R.A. § 33221(a)(1), (7)(G).

- The Uniform Administrative Procedure Act. This statute declares that agencies (like Treasury) can conduct inspections — "without a prior order" — to ensure compliance with the laws and regulations within the agencies' domain. See 3 L.P.R.A. § 2191.

- And Federación Operadores de Máquinas de Entretenimiento, Inc. v. Puerto Rico. After canvassing the relevant statutory and regulatory mosaic, this decision from Puerto Rico's intermediate appellate court — issued when defendants were still in the throes of investigating plaintiffs' AEMs — says that the AEM business is closely regulated. See 2010 WL 4792673, Civ. No. KLCE201000987 (TCA Aug. 30, 2010) (certified English translation, slip op. at 11-12, 18-19).[15]

Fairly viewed, this regime is at least as (if not more) pervasive than the one governing junkyards in Burger — so we agree with the district court that reasonable officials in defendants' shoes could believe that the AEM industry qualifies as closely regulated, at least at the time they acted.

---

[15] Opinions of a state's intermediate appellate court can be persuasive authority for interpreting state law. See, e.g., Candelario del Moral v. UBS Fin. Servs. Inc. of P.R., 699 F.3d 93, 102 (1st Cir. 2012).

Faced with this concatenation of circumstances, plaintiffs offer a creative argument. Stripped to its bare essence, they contend that tightly-regulated businesses are only those businesses that deal with devices that could endanger lives (e.g., guns) or that can serve as a fence for stolen goods (e.g., auto junkyards). And, they add, AEMs fit neither category. But they cite no authority for this limiting proposition — probably because businesses identified as closely regulated when defendants acted include those that are not inherently dangerous to persons (like, for example, auto junkyards) and that do not function as fences for thieves (like, for instance, daycares). That is a very big deal, because plaintiffs had the burden of showing that clearly established law when defendants searched the AEMs (in 2010) put reasonable officials on notice that AEMs were not closely regulated, see McGrath, 757 F.3d at 29 — a burden plaintiffs obviously have not come close to satisfying, as we just noted.[16]

---

[16] Plaintiffs' argument may have more traction given the Court's Patel decision. See Patel, 2015 WL 2473445, at *10 & n.5 (explaining that "[h]otels — like practically all commercial premises or services — can be put to use for nefarious ends," and adding that "unlike the industries that the Court has found to be closely regulated, hotels are not intrinsically dangerous"). But recall that Patel had not yet been decided.

Plaintiffs cite zero cases showing that reasonable officials in defendants' position would have believed that the regulatory scheme serves no substantial government interest. This is hardly a surprise given how then-existing caselaw (i.e., caselaw as of 2010) stressed that the commonwealth's "interest in the health, safety, and welfare of its citizens constitutes a substantial governmental interest"[17] and that regulating gambling "lies at the heart of the state's police power" to further important goals like protecting "the health, welfare, safety, and morals of its citizens."[18] Together these cases suggest (as the district court implicitly found) that reasonable persons in defendants' boots could have concluded the commonwealth has a significant interest in stopping persons from converting legal

---

[17] Posadas de P.R. Assocs. v. Tourism Co. of P.R., 478 U.S. 328, 341 (1986) (internal quotation marks omitted); see also United States v. Edge Broad. Co., 509 U.S. 418, 426 (1993).

[18] Johnson v. Collins Entm't Co., 199 F.3d 710, 720 (4th Cir. 1999); see also Ah Sin v. Wittman, 198 U.S. 500, 505-06 (1905) (explaining that "[t]he suppression of gambling is concededly within the police powers of a state"); Crutcher v. Commonwealth, 141 U.S. 47, 61 (1891) (emphasizing that the state's police power "extends to . . . the prohibition of lotteries, gambling, [and] horse-racing").

AEMs into illegal gambling machines, thereby keeping citizens from becoming gambling addicts.[19]

(e)
Interest Advancement

Plaintiffs also do not say how reasonable officials — in the circumstances confronted by each defendant and given the law as of 2010 — would have reasonably thought that warrantless inspections do not advance the just-described state interest. Maybe this is because the law books are chock-full of cases stressing how "surprise is an important component of an efficacious inspection regime." Maldonado, 356 F.3d at 135; accord Gonsalves, 435 F.3d at 68. Just look at Biswell, a case the district court relied on. The statute there required all licensed gun dealers to keep certain records. It also let officials enter the dealers' premises — without a warrant — to examine not only the records but also any firearms kept on the premises. See 406 U.S. at 312 n.1. And when all was said and done, the Court held that inspections could not "assure[] that weapons are distributed through regular channels and in a traceable manner and make[] possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms" if inspectors had to schedule

---

[19] Converting legal machines into illegal ones is not hard to do, apparently.

inspections in advance or conduct them only with warrants. Id. at 315-16; see also Dewey, 452 U.S. at 603 (highlighting Congress's conclusion that given "the notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained, a warrant requirement would seriously undercut this Act's objectives"). But again, plaintiffs put up no serious fight on whether the state's interest justifies warrantless inspections.

(f)
Warrant Substitute

Instead plaintiffs spend much energy emphasizing how (in their opinion) the last Burger requirement — that the scheme serve as a warrant equivalent — is not satisfied because neither the statutes nor the regulations limit the timing and scope of the agents' activities. Cf. 482 U.S. at 703 (holding that to be an adequate substitute for a warrant, the scheme "must perform the two basic functions of a warrant" — let owners know that the inspections are made pursuant to law, and be "carefully limited in time, place, and scope" (internal quotation marks omitted)). As a result, they add, agents can barge into establishments, break AEMs' locks, and inspect the machines whenever and however they please. Not so, defendants insist. The scheme, they say, cabins the agents' discretion because (to quote their brief) it tells AEM

owners "that the business is subject to inspection and who will conduct the same."[20]

Dealing with timing issues can be tricky business. Courts have okayed schemes limiting inspections to "regular and usual business hours," see Burger, 482 U.S. at 711, "all reasonable times," see Biswell, 406 U.S. at 312 n.1, and "all reasonable hours," see Gonsalves, 435 F.3d at 68. Our litigants direct us to no statutory or regulatory language like that here. And we see none.

Still, a regime may pass the Burger test even if there are no time limits — context is key, with precedent out there in 2010 okaying schemes with no timing limits if such limits would make inspections unworkable. See, e.g., United States v. Ponce-Aldona, 579 F.3d 1218, 1225-26 (11th Cir. 2009) (upholding a regulatory regime authorizing inspections of commercial trucks with no time restrictions — finding "[t]ime restrictions are not feasible because trucks operate twenty-four hours a day," noting "[i]f inspections were limited to daylight hours," for instance, trucks trying "to avoid inspection could simply travel at night," and collecting loads of additional cases). What matters then is whether the problems that triggered the AEM regulations are limited

---

[20] Best we can tell, the parties argue — as they did in district court — only over time and scope, not place.

to certain hours, like business hours.  See, e.g., United States v. Dominguez-Prieto, 923 F.2d 464, 470 (6th Cir. 1991) (noting "limitation [on searches of commercial carriers] would . . . render the entire inspection scheme unworkable and meaningless").

The difficulty here, however, is that the district court was silent on the timing issue.  Ditto for defendants.  As for plaintiffs, they insist the regime has no time limits.  But like defendants, they say nothing about whether timing restrictions would or would not make the inspection regime unworkable.  And the district court said nothing about this issue as well.  These omissions are significant because an answer on the timing question is critical for resolving either step in the qualified immunity analysis — i.e., whether defendants violated plaintiffs' constitutional rights, and, if so, whether those rights were clearly established at the time of the incident; again, if plaintiffs satisfy both steps of the qualified-immunity inquiry, then they can defeat that defense.

Similar problems plague the ever-so important scope issue.  Ever-so important, because a valid inspection regime requires "certainty and regularity" of application.  Burger, 482 U.S. at 703.  And if the regime offers no rules governing the procedure that agents must follow, "the Fourth Amendment and its various restrictive rules apply," Colonnade Catering, 397 U.S. at

- 31 -

77. Examples of inspection schemes deemed sufficiently narrow in scope when our defendants acted include:

- <u>Colonnade Catering</u>, where the statute let agents enter the premises of liquor dealers "'for the purpose of examining'" "'articles or objects subject to tax'" — though the high Court stressed that the statute did not empower agents to forcibly go into areas without a warrant but rather made it a criminal offense not to let inspectors in.  <u>See</u> 397 U.S. at 73 n.2, 77 (quoting 26 U.S.C. § 7606(a)).

- <u>Biswell</u>, where the statute let officials enter "'the premises'" of gun dealers "'for the purpose of inspecting or examining (1) any records or documents required to be kept . . ., and (2) any firearms or ammunition kept or stored.'" <u>See</u> 406 U.S. at 312 n.1 (quoting 18 U.S.C. § 923(g)).

- <u>Burger</u>, where the statute let agents "'examine'" the "'records'" of junkyard operators "'and any vehicles or parts of vehicles'" on the premises that "'are subject to the [statute's] record keeping requirements.'" <u>See</u> 482 U.S. at 694 n.1 (quoting N.Y. Veh. & Traf. Law § 415-a5).

- And <u>Gonsalves</u>, where the statute let agents enter drug-storage facilities "to determine whether 'any of the provisions of this chapter are being violated,' and to 'secure

samples or specimens.'"  See 435 F.3d at 36 (quoting R.I. Gen. Laws § 21-31-21).

The problem in our case is that the district court did not focus serious attention on the scope issue, even though it is — like timing — an essential consideration in deciding either step in the qualified-immunity analysis.  Yes, as defendants note, the regime tells AEM owners that agents can inspect licenses and other records.  See P.R. Treas. Reg. 7437, arts. 2040, 2044-1 (certified English translation, at 4, 23).  And yes, as defendants also note, the regime tells persons that agents can inspect "assets" tied to activities subject to taxation under a provision of the commonwealth's internal revenue code.  See 13 L.P.R.A. § 8140(a).  But defendants point to nothing — no statute, regulation, or rule — that explains either how agents can open AEMs or how they can and should go about inspecting them once opened.[21]  And if no such provision exists, the commonwealth's scheme fails to furnish even the minimal specificity needed to let an AEM owner know that "the inspections to which he is subject do not constitute discretionary acts by a government official."  Burger, 482 U.S. at 711.

(g)
Our Solution

---

[21] One would expect some analysis on this point, given how plaintiffs claim the procedure defendants used here greatly damaged the AEMs.

Given these serious gaps in the record and the parties' briefs, it makes perfect sense to remand the case so the district court can (with counsel's help) work on these all-important timing and scope matters in the qualified-immunity context — a tack taken by other circuits in similar circumstances, by the way. See, e.g., Kerns, 663 F.3d at 1182 (citing and quoting Distiso v. Town of Wolcott, 352 Fed. App'x 478, 482 (2d Cir. 2009) (unpublished)). This approach will let the "adversarial process . . . work through the problem," resulting in a "considered" lower court decision — a decision that will, importantly, reduce "the risk of an improvident governing appellate decision" from us. Id.[22] And — not willing to make uncertain assumptions about the law — we are doubly persuaded that this is the right course, given how complex the issues are and how the parties' briefs missed some of the legal nuances presented by this case.[23] See Kerns, 663 F.3d at 1181-82.

---

[22] Cf. generally Clifford v. M/V Islander, 751 F.2d 1, 9 n.4 (1st Cir. 1984) (reversing and remanding, in part, and explaining that "[w]ithout the benefit of any district court . . . discussion" on certain legal "matters, it would be idle for us to comment further about them").

[23] Puerto Rico's appeals court said the Games of Chance Act neither "authorize[s] . . . searches at any time of the day or night" nor "inspections outside of working hours." See Federación Operadores de Máquinas de Entretenimiento, Inc., 2010 WL 4792673, Civ. No. KLCE201000987 (certified English translation, slip op. at 22-23). That may be, but the appeals court did not back up the point with any legal analysis. See id. And that counsels a remand to the

In remanding to get the district court's thoughts on the crucial timing and scope issues, we offer this reminder: To defeat a qualified-immunity defense here, plaintiffs must show that defendants violated their Fourth Amendment rights and that those rights were clearly established at the time. See, e.g., Sheehan, 135 S. Ct. at 1774. Repeating what we said earlier, courts may (and sometimes should) decide qualified-immunity claims based solely on the second step — holding that the contours of the right were not clearly established, without deciding whether there was a constitutional violation. See, e.g., Pearson, 555 U.S. at 236. If the district court goes that route, both the court and the parties should be ever mindful that the qualified-immunity inquiry is highly context-specific, turning on whether it would be clear to reasonable officers in defendants' positions that their actions violated the Fourth Amendment, see, e.g., Rocket Learning, Inc., 715 F.3d at 10, and that defendants' positions run the gamut from policymakers to advisors to supervisors to implementers. We also leave it to the court on remand to resolve codefendants Gadea-Rivera, Diez de Andino, Vescovacci-Nazario, and Flores-Cortés's argument that they had no personal involvement in any alleged constitutional violation, as required by section 1983.

district court so that we can get a fuller picture of what Puerto Rico law says. See Kearns, 663 F.3d at 1181-82.

So a vacate and remand on this claim it is — but before we shift our focus to plaintiffs' next claim, we wish to make one thing crystal clear:  although Patel does not apply in this case (because of the qualified-immunity overlay), we note that the law governing administrative searches continues to develop and that the bench and bar must be on the look for situations where Patel does hold sway.

## Due-Process Claim

Plaintiffs believe defendants violated their federal due-process rights by not giving them hearings before seizing the AEMs.  Again asserting qualified immunity, defendants counter that they had to act quickly — because the AEMs "appeared to be operating illegally" — and that meaningful postdeprivation remedies are all the process that is due.

We begin with the basics.  Normally due process requires notice and a hearing of some sort before the government takes away property — the state, in other words, usually must say what it intends to do and then give affected persons the chance to speak out against it.  See, e.g., Zinermon v. Burch, 494 U.S. 113, 132 (1990); S. Commons Condo. Ass'n v. Charlie Arment Trucking, Inc., 775 F.3d 82, 85-86 (1st Cir. 2014).  "Normally" and "usually" are words that suggest exceptions.  And that is the case in this corner of the law, because due process is a "flexible" concept not

- 36 -

governed by any "[r]igid taxonomy."  See respectively Morrissey v. Brewer, 408 U.S. 471, 481 (1972); González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011); see also Cafeteria & Rest. Workers Union v. McElroy, 367 U.S. 886, 895 (1961); San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 687 F.3d 465, 488 (1st Cir. 2012) (en banc); Elena v. Municipality of San Juan, 677 F.3d 1, 9 (1st Cir. 2012).  As a for-instance, one exception (the one defendants rely on) is that the state need not give preseizure process if (a) doing so would defeat the point of the seizure — like when the property could be moved, concealed, or destroyed if advance notice is given — and (b) there is adequate postseizure process.  See Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 679-80 (1974); see also Zinermon, 494 U.S. at 132; Mathews v. Eldridge, 424 U.S. 319, 335 (1976); S. Commons Condo. Ass'n, 775 F.3d at 86.

Plaintiffs' right to preseizure process — an issue on which they bear the burden, see, e.g., Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006) — turns on whether the pined-for process is a reasonable requirement to impose.  And that requires comparing the benefit of the procedural protection sought — which involves the value of the property interest at issue and the probability of mistaken deprivations if the protection is not provided — with the cost of the protection; this is known in legal circles as the Mathews test.  See, e.g., United States v. James

- 37 -

Daniel Good Real Prop., 510 U.S. 43, 53 (1993) (discussing Mathews); Clukey v. Town of Camden, 717 F.3d 52, 59-60 (1st Cir. 2013) (ditto).  Dooming plaintiffs' due-process claim is their failure to say anything on this all-important test, giving us zero case analysis to help us see how this benefit/cost comparison would shake out.  What they have done is not the type of serious effort needed on a complex issue — especially when their briefs present a slew of other legally intricate claims.  And we will not do their work for them.  See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  So their complaint about not getting preseizure process is waived.  See, e.g., Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011).

Ever persistent, plaintiffs have a fallback position: even if the postseizure remedy they invoked (challenging the seizures in commonwealth court) is all the process due them, the AEMs' poor condition (missing games, torn cables, etc.) has left them unable to prove the AEMs' legality — meaning (the theory goes) that defendants robbed them of their due-process rights. Plaintiffs' argument goes nowhere, and fast, because they point us to no competent evidence (like an affidavit) showing that the AEMs' condition has kept (or will keep) them from having meaningful postseizure hearings — a foundation-less allegation in their brief certainly is not evidence.  See, e.g., Tropigas de P.R., Inc. v.

Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (making clear that "we afford no evidentiary weight to 'conclusory allegations, empty rhetoric, [or] unsupported speculation, or evidence'" (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001))); see also generally Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991) (pointing out that "[r]hetoric, unsupported by facts, remains only rhetoric, even if stridently proclaimed").  To move beyond summary judgment on this fallback theory, plaintiffs had to back up their allegation with evidence that creates a material dispute requiring trial.  But all they have given us is an allegation, which (again) does not cut it.  See, e.g., Tropigas de P.R., Inc., 637 F.3d at 56.

Please take note, though:  we are deeply (repeat, deeply) troubled by the damage done to the confiscated machines.  And the parties should know that we might have reached a different conclusion on the due-process question if plaintiffs had not waived the argument by failing to develop it.

## Equal-Protection Claim

We turn then to plaintiffs' equal-protection claim, which in essence is this:  Puig-Morales fined them but not the establishment owners over the illegal AEMs, the intention being to punish plaintiffs for opposing the installation of video-lottery terminals, his pet project — a plain-as-day equal-protection

- 39 -

violation, plaintiffs conclude. Defendants fight tooth and nail against this argument, spending a good deal of time trying to persuade us that the AEM owners and the establishment owners aren't sufficiently similar to require equal treatment.

All agree that equal-protection principles require government actors to treat like persons alike. See, e.g., Aponte-Ramos v. Álvarez-Rubio, 783 F.3d 905, 908 (1st Cir. 2015). All agree that — given the equal-protection theory they have picked — to get past summary judgment, plaintiffs must show selective treatment "compared with others similarly situated . . . based on impermissible considerations," like "intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995) (quoting Yerardi's Moody St. Rest. & Lounge v. Bd. of Selectman, 878 F.2d 16, 21 (1st Cir. 1989)); see also Aponte-Ramos, 783 F.3d at 908; Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001). And all agree that to carry their burden on the similarly-situated front, "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007) (quoting Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006)). A precise correlation is not necessary, though

plaintiffs must muster "sufficient proof on the relevant aspects of the comparison to warrant a reasonable inference of substantial similarity." Id. (adding that while "normally" the similarly-situated determination is "grist for the jury's mill," a judge can dispose of an equal-protection claim via summary judgment if plaintiffs fail to shoulder their burden on this critical issue).

Plaintiffs stumble on the substantial-similarity requirement — i.e., that they show a satisfactory comparator who was similarly situated and yet treated differently. The pivot-point of their argument is the idea that Puig-Morales acted maliciously by fining them as punishment for not backing his pet project.[24] Given their theory, and keeping in mind that a comparator must be similarly situated in "all relevant respects," id. at 251, the appropriate similarly-situated pool must be composed of people who should have been fined for the (supposedly) illegal AEMs (with the different treatment being leniency for those who didn't oppose the project, plaintiffs argue — at least

_____

[24] A quick aside: Plaintiffs' equal-protection argument comes dangerously close to being a mere rehash of the speech-retaliation claim (which we discuss in a minute). And we remind the bench and bar that an equal-protection claim that merely restates a First-Amendment claim should be considered under the First Amendment. See, e.g., Aponte-Ramos, 783 F.3d at 908 n.4; Uphoff Figueroa v. Alejandro, 597 F.3d 423, 430 n.8 (1st Cir. 2010).

implicitly).  As for their suggestion that the establishment owners populate the similarly-situated pool, we see a serious problem:

Plaintiffs never develop the legal basis for concluding that Puig-Morales could have fined the establishment owners.  As we mentioned many pages ago, a Puerto Rico statute provides that "[t]he Secretary shall impose an administrative fine on the owner of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000) for each violation" of the Games of Chance Act.[25]  15 L.P.R.A. § 84a(a).  "Secretary" means the Treasury secretary.  15 L.P.R.A. § 82a(c).  And "[o]wner" means the "person who owns the adult entertainment machine."  15 L.P.R.A. § 82a(f).  Not a word in section 84a(a) says that the secretary can fine establishment owners.[26]  And plaintiffs never stop to confront this provision — they never explain, for example, how the secretary can fine establishment owners in the face of that section.[27]  Litigants

---

[25] Puig-Morales clearly alluded to this section at his deposition when he explained how he had told agents to fine AEM owners "five thousand dollars, per machine," which, he added, is "the lesser amount."

[26] Again, for all intents and purposes, plaintiffs treat AEM owners and establishment owners as mutually exclusive groups.

[27] A different provision of the Games of Chance Act — section 84a(b)(1) — talks about fines for "[e]very" AEM owner "or any other person, operator, or attendant in a business or establishment" convicted of introducing illegal machines.  The fines range from $200 to $400 for the first conviction, and $300 to $500 for the second.  "[P]erson[s]" convicted of other offenses under the act "shall" be fined too, with the maximum "fixed penalty" being

should know by now that it is not for us "to create arguments for someone who has not made them" or even "to assemble them from assorted hints and references scattered throughout the brief." Yeomalakis v. FDIC, 562 F.3d 56, 61 (1st Cir. 2009). Clearly then, any argument tied to Puig-Morales's fining powers is waived. See, e.g., Rodríguez, 659 F.3d at 175-76.

The upshot is that plaintiffs have not carried their burden of proving substantial similarity. So their equal-protection claim is a no-go.

## Speech-Retaliation Claim

That takes us to Rivera-Corraliza's claim that defendants seized PJ Entertainment's AEMs as payback for his speaking out about Puig-Morales's vendetta against AEM owners. To get anywhere he of course must show that his exercise of constitutionally-protected speech was a "substantial" or "motivating factor" behind defendants' actions. See González-Droz, 660 F.3d at 16. "[C]lose" temporal proximity between a plaintiff's protected activity and the state's retaliatory conduct can "raise an inference of causation." See id. at 16-17. The key word in that last sentence (at least so far as this case is concerned) is "close." See id. at 17 (discussing caselaw holding

$1,000. See 15 L.P.R.A. § 84a(b)(3). Plaintiffs develop no argument based on these provisions.

a several month's gap between protected speech and supposedly retaliatory conduct insufficient to prove causation).

Rivera-Corraliza thinks close proximity exists here, saying in his opening brief that he continued calling Puig-Morales out in the press through "the beginning of 2010" — and, remember, defendants started grabbing PJ Entertainment's AEMs in February 2010. But Rivera-Corraliza does not identify any record facts to support his (completely conclusory) proximity assertion. Basically he invites us either to treat what he says as true or to comb the record without his help to confirm his story. We decline the invitation. See Rodríguez–Machado v. Shinseki, 700 F.3d 48, 50 (1st Cir. 2012) (per curiam) (reminding everyone that we appellate "[j]udges are not like pigs, hunting for truffles buried in" the record (alteration in original) (internal quotation marks omitted)). His claim is therefore waived. See, e.g., Metro. Prop. & Cas. Ins. Co. v. Shan Trac, Inc., 324 F.3d 20, 26 (1st Cir. 2003) (citing Zannino, 895 F.2d at 17).

### Local-Law Claims

One last issue. Because we vacate the entry of summary judgment on the search-and-seizure claim and remand for proceedings in line with this opinion, the district court should reinstate the local-law claims. See Rodríguez, 659 F.3d at 181-82 (1st Cir. 2011). If the court again jettisons the search-and-

seizure claim before trial, it of course can reassess whether to keep jurisdiction over the local-law claims.  See id. at 182.

## Final Words

For the reasons recorded above, we **vacate** the summary judgment on the search-and-seizure and local-law claims and **remand** for proceedings consistent with what we have said.  We **affirm** in all other respects.

**No costs to either side**.